UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER ROSE

        Plaintiff,

    v.

UNITED STATES OF AMERICA et al.,

        Defendants.

Case : 1 :07-cv-00926 (RWR)
Hon. Richard W. Roberts

### OPPOSITION TO DEFENDANT DISTRICT OF COLUMBIA'S MOTION TO DISMSS, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

    COMES NOW THE Plaintiff, Peter Rose, by and through undersigned counsel, and in support of his above-entitled opposition, states as follows:

    1.    Defendant's primary argument is that Plaintiff's present lawsuit is barred by res judicata and/or collateral estoppel. Neither, however is applicable because Plaintiff could not have challenged the Constitutionality and validity of Criminal Rule 118 prior to exhausting his remedies under the Rule. Thus, while Defendant characterizes Plaintiff's motions, hearings, and appeal as having had "multiple bites of the same apple, " these were nothing more than Plaintiff's diligent efforts to exhaust his remedies in order to avoid having to make a Constitutional challenge. Prior to exhausting these remedies, the possibility of Plaintiff's arrest record being sealed was alive and well under Criminal Rule 118, and thus Plaintiff at that time lacked actual damages arising from the application of the statute, and his Constitutional challenge would have been dismissed for lack of ripeness.

    2.    In res judicata parlance, no "issue preclusion" exists because the issue of the Constitutionality of the statute has never before been addressed in Mr. Roses' case. It was only raised for the first time after Mr. Rose's appeal to the D.C. Court of Appeals was denied, when Mr. Rose filed a petition for rehearing by the D.C. Court of Appeals ("Appellant's Petition for Rehearing By the Division or for Rehearing En Banc"), for it was only then that the issue of the Constitutionality of the statute first became ripe. Plaintiff's petition for rehearing was denied without being considered on the merits.

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

3.  No "claim preclusion" exists because the claim arose only upon the D.C. Court of Appeals' denial of Mr. Roses' appeal. Thus, the present lawsuit is the first time Mr. Rose has filed suit on the facts from which his Constitutional damage arose – those facts being the denial under Criminal Rule 118 of Mr. Rose's request to have his record sealed.

4.  The Court does have jurisdiction because what is *not* being litigated in the present lawsuit is whether the D.C. courts were correct in determining whether Mr. Rose met the burden of proving actual innocence by clear and convincing evidence. Rather, the instant lawsuit challenges whether it was lawful to require Mr. Rose to have to prove his innocence at all.

5.  The fact of the matter is, as is explained in great depth in Mr. Rose's affidavit in support of this Opposition, that from the time of Mr. Rose's arrest onward, the Government never could have proven its case, and thus Mr. Rose never should have had to prove his actual innocence to have his arrest record sealed. Indeed, the Government's charges were first dismissed for lack of probable cause, and then, when other charges were brought a year later based on the same arrest, they were voluntarily dismissed by the Government because the Government knew it could not make its case. (*See* Rose Affidavit.) In fact, the Government's lack of a cognizable case is clear, in that at the hearing on the Plaintiff's Motion to Seal, the presiding Superior Court Judge, in issuing the denial of the Motion to Seal, stated unequivocally that there "is no question…[that] there is not proof beyond a reasonable doubt [to support a conviction]." *See Rose v. U.S.,* 879 A.2d 986 at 989 (D.C. 2005).

6.  In view of the Government never having had sufficient grounds to convict Mr. Rose, it is totally unfair and unconstitutional to now place the burden on Mr. Rose to prove a negative, in order to have the black mark of his arrest expunged.

7.  The Government next argues that the Plaintiff is not entitled to the protections of the U.S. Constitution because D.C. state court opinions listed in the Government's motion characterize motions to seal as seeking equitable relief, and thus civil in nature. This characterization conveniently allows the D.C. state courts to then rationalize that it should apply the traditional rule that in civil actions the burden of proof begins with the burden of proof being on the movant.[1]

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

---

[1] Indeed, since the D.C. state court promulgated Rule 118, there is a direct conflict in interest in having that same Court rule on its validity. The state court's apparent bias toward upholding the defective Rule is evident in the D.C. state Court's convenient mischaracterization of Criminal Rule 118 as civil in nature, -- despite it being a Rule of **Criminal** Procedure – and despite it, as explained herein, clearly not being civil in nature.

2

8. In reality, however, the nature of the present case is nowhere near the likes of a conventional civil matter. This is not a case where the Government is acting equivalently to a private party (e.g. as a purchaser of services). Rather, the matter at hand arises solely from the Government's application of its criminal powers. Indeed, the Government's motion for summary judgment argues that the sole purpose for maintaining Mr. Roses' arrest record is "**law enforcement** purposes."

9. However the proceeding is characterized, the Government's arresting Mr. Rose, and refusing to seal that arrest record despite all charges being dismissed for lack of probable cause and because the Government could not otherwise make its case in court, has resulted in Mr. Rose being deprived of his life liberty and property without due process of law, with said deprivation directly through governmental action. Indeed, in *Dawkins v. U.S.*, the D.C. Court of Appeal itself recognized, in the context of issues relating to the sealing of arrest records, that an individual's Constitutional liberty and property rights *are* implicated where interests such as employment, are affected. 535 A.2d 1383, 1386 at n. 3 (D.C. 1988) ("The Supreme Court has held that its prior cases do 'not establish the proposition that reputation alone, ***apart from some more tangible interests such as employment***, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause.' *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976)") (*emphasis added)*.

10. Indeed, the application of Constitutional protections is clear when one looks at another arguably civil matter closely related to criminal process – civil forfeitures. While federal forfeiture law permits the Government to seize assets of suspected criminals, the initial burden on showing that the seizure is valid is on the *Government*, not on the suspect. 18 U.S.C. §983(c)(1). Even when the government meets its statutory burden of proof, the Courts have still stated that it is far from clear that the forfeiture meets Constitutional muster. *Cf. United States v. $49,576*, 116 F.3d 425, 429 (9th Cir. 1997) ("allowing the government to forfeit property based on a mere showing of probable cause is a 'constitutional anomaly'"); *United States v. Bajakajian,* 524 U.S. 321(1998) (full forfeiture of respondent's $357,144 would violate the Excessive Fines Clause of the 8th Amendment).[2]

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850
TELEPHONE 301-294-9200

---

[2] Similarly, D.C.'s newly enacted arrest record sealing statute, DC Code Sec. 16-801 et. seq. places the burden of proof on the Government to prove that sealing of publicly available records should not occur, when the arrestee files a motion to seal after a two-year statutory waiting period and concerns an eligible misdemeanor whose prosecution was terminated without conviction. *See* 16-803(a) and 16-803(i)(1). It is also worth noting that Congress felt it

11. Moreover, the Government's logic that the presumption of innocence only applies at the trial stage of a criminal proceeding totally undermines the limited purpose for which the Government is authorized to arrest citizens -- that purpose being because probable cause exists to believe the arrestee committed a provable crime -- and invites and authorizes widespread use of arrests to produce records which would deprive citizens for the rest of their lives of their Constitutional rights to life, liberty and property – even when, as in Mr. Roses' case, the initial arrest lacked probable cause!

12. Furthermore, contrary to the Government's contentions, the Plaintiff's complaint sufficiently alleges deprivation of constitutionally protected life, liberty, and property rights.[3] The Government insensitively and naively trivializes the adverse impacts described in Mr. Rose's Complaint as nothing more than "embarrassment and delay." However, there is nothing trivial about Mr. Rose's top-secret security clearance, which is a very important part of his job, having not been granted solely because of the records of the subject arrest. *See* Rose Affid. Likewise, while his job should entail meeting with the U.S. President, as alleged in the Complaint, this access has also been denied solely because of the records of the subject arrest. Moreover, in the highly competitive consulting industry in which Mr. Rose works, as alleged in the Complaint, the denial of access to important Government officials; the embarrassment he has suffered; the avoiding of lucrative and beneficial business meetings and opportunities so as to avoid future embarrassment; and the being restricted in his ability to travel; all significantly

---

necessary to increase the Government's burden of proof in civil forfeitures from merely showing probable cause to having to show a preponderance of the evidence. *See* the Civil Asset Forfeiture Reform Act (CAFRA) of 2000. To the extent that civil forfeitures have been deemed Constitutional by some courts, a critical component of such conclusions, of course would be that, unlike Criminal Rule 118, the initial burden of proof is on the Government.

[3] While the Complaint specifically references the Fifth Amendment, the Complaint also clearly states that it is being brought pursuant to any and all applicable portions of the Constitution. *See, e.g.,* Complaint, par. 4, alleging that the action is pursuant "to the U.S. Constitution, and in particular, the Fifth Amendment thereto." Thus, for example, the Complaint also sues for violations of the 14th Amendment, which Amendment provides that
> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

In this regard, it is noted that since Rule 118 permits some persons whose cases were terminated without conviction to seal their records, while not permitting others, it violates Mr. Rose's right to equal protection. As also explained in the Complaint and body of this Opposition, in that Mr. Roses' life, liberty or property and freedom from fear and delay in traveling have been limited, other portions of the 14th Amendment are also violated by Criminal Rule 118. Likewise, Criminal Rule 118 may violate the 8th Amendment's proscriptions on excessive fines and cruel and unusual punishment since the effect of not sealing the arrestee's is in effect a penalty; and the 10 Amendment which limits the Government's powers outside of law enforcement which law enforcement is conducted under due process of law.

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

impact Mr. Rose's ability to perform his job, earn income, advance his career, and enjoy his rightful life and liberty.

13. Indeed, even in the absence of any specific example of the adverse impact of an arrest record on an arrestee's life, liberty and property rights, a grossly adverse impact presumptively exists, as was found by the Committee on the Judiciary of the D.C. Council, who recently wrote that "An arrest record alone has considerable potential for adverse consequences in the areas of private employment, government employment, governmental housing, admission to the military, and the acquisition of credit…Even a minor conviction can have consequences **creating a de facto sentence without the possibility of parole**." D.C. Council, Comm. On the Judiciary, Rep. On Bill 16-746, the Crim. Rec. Sealing Act of 2006, 16th Period, at 1 (D.C. 2006). (*quoting* Expungement Subcomm., Council for Court Excellence Apr. 14, 2006 Rep. (D.C. 2006) (emphasis added). The Committee went so far as to state that "[t]he District has a responsibility to engage in the meaningful rehabilitation of its citizens," but "[t]oo often, the stigma of a criminal record outweighs any rehabilitative efforts by the individual or the unique circumstances of their case." Id. at 2. Indeed, beyond those adverse impacts specifically enumerated by Mr. Rose, there likely have been and will be other adverse impacts on Mr. Rose's employment, personal relationships, and business relationships, of which he is not even aware, but that arose on account of his arrest record. Thus the averment of specific deprivations and interferences with Mr. Rose's life, liberty or property need not be made for the Complaint to stand muster.

14. Looking beyond Mr. Rose's individual case for a moment, the bottom line is if the Government does not or cannot convert an arrest into a guilty plea or conviction, then, in view of the presumption of innocence afforded to U.S. citizens, and the significant negative impact that arrest records have in today's Information Society, the arresstee's Constitutional rights, including the rights to life, liberty, and property, *require* that the arrest be expunged from publicly available as well as confidential law enforcement records. The very fabric of our society requires this, otherwise we are merely encouraging and empowering our Government to abuse the threat of arrest simply to intimidate us, and also to arrest our citizens at will, thereby imposing consequences that should only arise upon a conviction or guilty plea.

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

5

WHEREFORE, Plaintiff respectfully requests that the Defendants' motion be denied and for such other and further relief as Plaintiff's cause may require.

**Plaintiff requests an oral hearing.**

Respectfully submitted,

 /s/ Bernard Solnik
Bernard A. Solnik, Esq. (D.C. Bar #448453)
11 N. Washington Street, Suite 640
Rockville, MD 20850
Tel. 301-294-9200
Attorney for Plaintiff

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER ROSE

       Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

       Defendants.

Case : 1 :07-cv-00926 (RWR)
Hon. Richard W. Roberts

**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

COMES NOW Plaintiff, by and through undersigned counsel, and hereby submits the following counterstatement of material facts not in dispute in support of its opposition to Defendant District Of Columbia's Motion To Dismiss, Or, In The Alternative, Motion For Summary Judgment.

1. On or about January 16, 1999, Mr. Rose and a companion entered a taxicab in the District of Columbia, and Mr. Rose was assaulted and battered by the taxi driver after the driver refused to drive Mr. Rose to Mr. Rose's home in Virginia and instead decided on his own to drive Mr. Rose to some destination that the driver refused to disclose to Mr. Rose. ("Affidavit Of Peter J. Rose In Support Of Opposition To Defendant District Of Columbia's Motion To Dismiss, Or, In The Alternative, Motion For Summary Judgment," hereinafter referred to as "Rose Affidavit".)

2. The taxi cab driver contacted the U.S. Park Police, an officer of which, with nothing more than a copy of the faxed incident report to go on, and without having spoken to or seen the taxi cab driver, then visited Mr. Rose in the early dawn hours at Mr. Rose's home with his weapon drawn, demanding that Mr. Rose confess to attacking the cab driver. Mr. Rose absolutely refused to confess to any such thing, as it was untrue and Mr. Rose showed the officer the eye injury Mr. Rose suffered during the driver's assault on him. Mr. Rose asserted his innocence, told the officer that Mr. Rose had a witness to the driver's assault on Mr. Rose, who was Mr. Rose's companion passenger in the cab, and that Mr. Rose certainly would not admit to having committed any unlawful act that did not occur. The officer demanded that Mr. Rose come to the police station for questioning no later than noon that same day. Mr. Rose agreed to

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850
TELEPHONE 301-294-9200

come in for questioning and to bring his witness and counsel. At about 10:00 a.m. that morning, Mr. Rose's attorney contacted the officer to arrange the interview, and despite it being well before noon, the officer nonetheless told Mr. Rose's counsel that Mr. Rose had had his chance to cooperate, and that the officer was now going to obtain a warrant for Mr. Rose's arrest. (Rose Affidavit)

3. On or about January 19, 1999, Mr. Rose's counsel was notified that a warrant had been issued for Mr. Rose's arrest. Mr. Rose's counsel arranged for Mr. Rose to turn myself in on January 21, 1999. When Mr. Rose arrived at the U.S. Park Police headquarters on January 21, 1999, that same U.S. Park Police officer sought, by deception, intimidation, and violence, to frighten/force a confession from Mr. Rose to the aforesaid alleged attack on the cab driver, which attack simply did not occur. Mr. Rose's attorney at the time, Mr. James L. O'Dea, witnessed many of these improper tactics by the officer on January 21, 1999. (Rose Affidavit).

4. As a result, this police officer involved was subsequently investigated by the U.S. Park Police for misconduct. (Rose Affidavit).

5. Immediately after being arrested at the U.S. Park Police headquarters, Mr. Rose was placed in a jail cell for twelve hours. Mr. Rose was charged with felony robbery, misdemeanor assault, and misdemeanor taking property without right (said property being the taxi driver's car keys) in docket number 1999 FEL 431. Interestingly, to the best of Mr. Rose's recollection, the incident report filed by the responding officer who had met with the cab driver on January 16, 1999 near the scene of the alleged incident shortly after it supposedly had occurred noted that despite the cab driver's claim that his car keys had been stolen, the cab driver did in fact have his keys and had been driving his vehicle after the keys had allegedly been stolen by Mr. Rose! (Rose Affidavit.)

6. On April 1, 1999, the felony count was dismissed for lack of probable cause. The remaining misdemeanor counts were nolle prossed. *See* 1999 FEL 431 exhibits to Defendant's Motion.

7. Despite no probable cause having been found, *over a year later*, on April 6, 2000, most likely in retaliation for Mr. Rose instigating an internal affairs probe of the arresting officers' egregious misconduct during Mr. Rose's arrest, that officer apparently filed misdemeanor information charges on the misdemeanor simple assault and taking property without right charges. (Rose Affidavit and see also Docket # M 4035-00.)

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850
TELEPHONE 301-294-9200

8. On April 7, 2000, Mr. Rose was arraigned and entered a plea of "not guilty." The case was then set on course for trial. (Rose Affidavit.)

9. The Government then offered a plea bargain, which Mr. Rose flatly refused, since Mr. Rose was completely innocent. Then, the day before the March 9, 2001 court date, the Government initiated contact with Mr. Rose's lawyer to *again* seek Mr. Rose's acceptance of a plea bargain. The only logical reason for the Government taking this extraordinary step of picking up the phone and calling Mr. Rose's lawyer to again offer a plea bargain was that the Government knew it could not prove its case. This is borne out by the fact that Mr. Rose's lawyer flatly refused the Government's offer and told the Government that Mr. Rose was prepared to go to trial, and yet at the March 9, 2001 hearing, the Government dropped the case. The Government's witness (the complainant cab driver) was at that hearing and he reacted to the dismissal with extreme visible anger and loud rage upon learning that the case had been dropped (demonstrating the same rage and violent behavior that he exhibited during his assault and battering of Mr. Rose on January 16, 1999). The cab driver made it clear that he wanted Mr. Rose to go to trial. Obviously, this all shows that the Government chose not to proceed because the Government could not have proven its case. Mr. Rose is certainly not surprised, because Mr. Rose knows that the truth is that he did not hit or rob the cab driver. (Rose Affidavit).

10. The Government's lack of a provable case was reiterated at the hearing on Mr. Rose's Motion to Seal, in which the presiding Superior Court Judge, in issuing the denial of the Motion to Seal, stated unequivocally that there "is no question…[that] there is not proof beyond a reasonable doubt [to support a conviction]." *See Rose v. U.S.*, 879 A.2d 986 at 989 (D.C. 2005).

11. Mr. Rose subsequently appealed the decision. The appeal was denied. *See Rose v. U.S.*, 879 A.2d 986 at 989 (D.C. 2005).

12. Mr. Rose then filed a petition for rehearing or rehearing en banc, which, for the first time, raised a challenge to the Constitionality of Criminal Rule 118.

13. The DC Court of Appeals denied the petition without addressing the substantive arguments therein. (*See* Exhibit 7 to Defendant's Motion.)

14. Mr. Rose is, and was at all times relevant to the allegations of this Complaint, a natural person and citizen of the United States. (Rose Affid.)

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850
TELEPHONE 301-294-9200

15. Mr. Rose is and was at all times described in this Complaint a private legal and policy consultant in the area of military defense whose clients do now and in the past have included major defense industry businesses serving the United States. (Rose Affid.)

16. Mr. Rose is a former fulltime Congressional staffer whose jobs included serving as the Legislative Director for a U.S. Representative. I have at various times mentioned in the Complaint held a top-secret clearance from the U.S. Department of Defense. (Rose Affidavit)

17. Mr. Rose's job as a Congressional staffer and consultant, until his arrest, involved access to the Oval Office of the White House; the Pentagon; and access to other secure Government areas. (Rose Affidavit)

18. Mr. Rose's job also has and continues to require frequent travel throughout the U.S. and the world. (Rose Affidavit)

19. Since his arrest, Mr. Rose was prevented from entering the White House in August 2000 despite having been invited by President Clinton while he was President. When Mr. Rose arrived at the White House gates with his clients, Mr. Rose was detained and questioned by the Secret Service for over two hours! The Secret Service Agent in charge that day told Mr. Rose that the reason Mr. Rose was detained, questioned, and denied access to the White House was that a background check showed that Mr. Rose had been arrested and charged with the aforesaid criminal offenses. (Rose Affid.)

20. Mr. Rose has also been invited to the White House by our current President Bush but Mr. Rose, of course, had to decline because Mr. Rose knew he would not be granted access due to his arrest record and Mr. Rose certainly did not want to be subjected to the same experience, and professional and personal embarrassment as he did when President Clinton invited him. (Rose Affid.)

21. Mr. Rose has suffered and continues to suffer other severe adverse consequences solely as a result of the record of the 1999 arrest, including the following:

    a. being delayed and detained for nearly an hour by uniformed Secret Service agents, right in front of his client, at the entrance to a meeting at the Office of Management & Budget, which detention resulted in Mr. Rose missing the meeting entirely;

    b. being delayed and detained for approximately thirty minutes by uniformed Secret Service agents, right in front of a client, at the entrance to the Old Executive Office

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850
TELEPHONE 301-294-9200

Building, where Mr. Rose was to meet with high level White House staff concerning homeland security, after which time Mr. Rose was only permitted to enter the building under embarrassing restricted procedures that required that he be escorted in the building by a uniformed Secret Service officer;

c. having to decline additional invitations to meet with our current President Bush and invitations to meet with other key Executive Branch officials because, based on Mr. Rose's prior experience, he knew he would be denied access;

d. being disqualified from the Transportation Security Administration Registered Traveler Pilot Program, which program is designed to expedite the airport screening process for frequent travelers;

e. having heightened fear and apprehension whenever in contact with law enforcement (*e.g.*, when Mr. Rose was stopped by a police officer for a routine traffic violation, the officer, upon learning of his arrest for felony robbery, immediately changed his attitude from friendly to defensive, on edge, suspicious and threatening, and the officer even went so far to ask to search Mr. Rose's vehicle even though the officer had no probable cause or reason to suspect anything beyond a simple traffic violation, other than his knowledge of Mr. Rose's felony arrest); and

f. being embarrassed when a colleague happened to come across Mr. Rose's arrest record in the Superior Court's public records database.

(Rose Affid.)

22. In addition, Mr. Rose's top-secret Department of Defense security clearance has not been renewed and the only reason that this can be is the arrest record arising from the January 16, 1999 arrest. This denial of the renewal of Mr. Rose's clearance continues to significantly hinder Mr. Rose's ability to perform his job effectively. (Rose Affid.)

23. As a result of all of the foregoing adverse impacts suffered by Mr. Rose, Mr. Rose's ability to perform his job (which is in a highly competitive field), earn income, advance his career, and travel freely and without undue fear have been severely and adversely impacted by the arrest record. (Rose Affid.)

Respectfully submitted,

/s/ Bernard Solnik

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850
TELEPHONE 301-294-9200

5

Bernard A. Solnik, Esq. (D.C. Bar #448453)
11 N. Washington Street, Suite 640
Rockville, MD 20850
Tel. 301-294-9200
bsolnik@solniklaw.com

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER ROSE

      Plaintiff,

v.

UNITED STATES OF AMERICA et al.

      Defendants.

Case : 1 :07-cv-00926 (RWR)
Hon. Richard W. Roberts

Affidavit Of Peter J. Rose In Support Of Opposition To Defendant District
Of Columbia's Motion To Dismiss, Or, In The Alternative, Motion For Summary Judgment

The undersigned, hereby affirms as follows:

1. That I am at least eighteen (18) years of age; that I am competent to testify, and that I declare under penalty of perjury that this Affidavit is true and correct to the best of my personal knowledge, information and/or belief.

2. On or about January 16, 1999, a companion and I entered a taxicab in the District of Columbia, and I was assaulted and battered by the taxi driver after he refused to bring me to my home in Virginia and instead decided on his own to drive me to some destination that he refused to disclose to me.

3. The taxi cab driver contacted the U.S. Park Police, an officer of which, with nothing more than a copy of the faxed incident report to go on, and without having spoken to or seen the taxi cab driver, then visited me in the early dawn hours at my home with his weapon drawn, demanding that I confess to attacking the cab driver. I absolutely refused to confess to any such thing, as it was untrue and I showed him the eye injury I suffered during the driver's assault on me. I asserted my innocence, told the officer that I had a witness to the driver's assault on me, who was my companion passenger in the cab, and that I certainly would not admit to having committed any unlawful act that did not occur. The officer demanded that I come to the police station for questioning no later than noon that same day. I agreed to come in for questioning and to bring my witness and counsel. At about 10:00 a.m. that morning, my attorney contacted the officer to arrange the interview, and despite it being well before noon, the officer nonetheless told my counsel that I had had my chance to cooperate, and that he was now going to obtain a warrant for my arrest.

4. On or about January 19, 1999, my counsel was notified that a warrant had been issued for my arrest. My counsel arranged for me to turn myself in on January 21, 1999. When I arrived at the U.S. Park Police headquarters on January 21, 1999, that same U.S. Park Police officer sought, by deception, intimidation, and violence, to frighten/force a confession from me to the aforesaid alleged attack on the cab driver, which attack simply did not occur. My attorney at the time, Mr. James L. O'Dea, witnessed many of these improper tactics by the officer on January 21, 1999.

5. As a result, this police officer involved was subsequently investigated by the U.S. Park Police for misconduct.

6. Immediately after being arrested at the U.S. Park Police headquarters, I was placed in a jail cell for twelve hours. I was charged with felony robbery, misdemeanor assault, and misdemeanor taking property without right (said property being the taxi driver's car keys) in docket number 1999 FEL 431. Interestingly, to the best of my recollection, the incident report filed by the responding officer who had met with the cab driver on January 16, 1999 near the scene of the alleged incident shortly after it supposedly had occurred noted that despite the cab driver's claim that his car keys had been stolen, the cab driver did in fact have his keys and had been driving his vehicle after the keys had allegedly been stolen by me!

7. On April 1, 1999, the felony count was dismissed by the Court because of a lack of probable cause. The remaining misdemeanor counts were nolle prossed.

8. Despite no probable cause having been found, *over a year later*, on April 6, 2000, most likely in retaliation for my instigating an internal affairs probe of the arresting officers' egregious misconduct during my arrest, that officer apparently filed misdemeanor information charges on the misdemeanor simple assault and taking property without right charges. See Docket # M 4035-00.

9. On April 7, 2000, I was arraigned and entered a plea of "not guilty." The case was then set on course for trial.

10. The Government then offered a plea bargain, which I flatly refused, since I was completely innocent. Then, the day before the March 9, 2001 court date, the Government initiated contact with my lawyer to *again* seek my acceptance of a plea bargain. The only logical reason for the Government taking this extraordinary step of picking up the phone and calling my lawyer to again offer a plea bargain was that the Government knew it could not prove its case. This is borne out by the fact that my lawyer flatly refused the Government's offer and

told the Government that I was prepared to go to trial, and yet at the March 9, 2001 hearing, the Government dropped the case. The Government's witness (the complainant cab driver) was at that hearing and he reacted to the dismissal with extreme visible anger and loud rage upon learning that the case had been dropped (demonstrating the same rage and violent behavior that he exhibited during his assault and battering of me on January 16, 1999). The cab driver made it clear that he wanted me to go to trial. Obviously, this all shows that the Government chose not to proceed because the Government could not have proven its case. I am certainly not surprised, because I know that the truth is that I did not hit or rob the cab driver.

11. The Government's lack of a provable case was reiterated at the hearing on my Motion to Seal, in which the presiding Superior Court Judge, in issuing the denial of the Motion to Seal, stated unequivocally that there "is no question…[that] there is not proof beyond a reasonable doubt [to support a conviction]." *See Rose v. U.S.*, 879 A.2d 986 at 989 (D.C. 2005).

12. I am and at all times referred to in this Affidavit and in the allegations of my Complaint, a natural person and citizen of the United States.

13. I am and was at all times described in this Complaint a private legal and policy consultant in the area of military defense whose clients do now and in the past have included major defense industry businesses serving the United States.

14. I am a former fulltime Congressional staffer whose jobs included serving as the Legislative Director for a U.S. Representative. I have at various times mentioned in the Complaint held a top-secret clearance from the U.S. Department of Defense.

15. My job as a Congressional staffer and consultant, until my arrest, involved access to the Oval Office of the White House; the Pentagon; and access to other secure Government areas.

16. My job also has and continues to require frequent travel throughout the U.S. and the world.

17. Since my arrest, I was prevented from entering the White House in August 2000 despite having been invited by President Clinton while he was President. When I arrived at the White House gates with my clients, I was detained and questioned by the Secret Service for over two hours! The Secret Service Agent in charge that day told me that the reason I was detained, questioned, and denied access to the White House was that a background check showed that I had been arrested and charged with the aforesaid criminal offenses.

18. I have also been invited to the White House by our current President Bush but I, of course, had to decline because I knew I would not be granted access due to my arrest record and I

certainly did not want to be subjected to the same experience, and professional and personal embarrassment as I did when President Clinton invited me.

19. I have suffered and continue to suffer other severe adverse consequences solely as a result of the record of the 1999 arrest, including the following:

   a. being delayed and detained for nearly an hour by uniformed Secret Service agents, right in front of my client, at the entrance to a meeting at the Office of Management & Budget, which detention resulted in my missing the meeting entirely;

   b. being delayed and detained for approximately thirty minutes by uniformed Secret Service agents, right in front of a client, at the entrance to the Old Executive Office Building, where I was to meet with high level White House staff concerning homeland security, after which time I was only permitted to enter the building under embarrassing restricted procedures that required that I be escorted in the building by a uniformed Secret Service officer;

   c. having to decline additional invitations to meet with our current President Bush and invitations to meet with other key Executive Branch officials because, based on my prior experience, I knew I would be denied access;

   d. being disqualified from the Transportation Security Administration Registered Traveler Pilot Program, which program is designed to expedite the airport screening process for frequent travelers;

   e. having heightened fear and apprehension whenever in contact with law enforcement (*e.g.*, when I was stopped by a police officer for a routine traffic violation, the officer, upon learning of my arrest for felony robbery, immediately changed his attitude from friendly to defensive, on edge, suspicious and threatening, and the officer even went so far to ask to search my vehicle even though the officer had no probable cause or reason to suspect anything beyond a simple traffic violation, other than his knowledge of my felony arrest); and

   f. being embarrassed when a colleague happened to come across my arrest record in the Superior Court's public records database.

20. In addition, my top-secret Department of Defense security clearance has not been renewed and the only reason that this can be is my arrest record arising from the January 16, 1999 arrest. This denial of the renewal of my clearance continues to significantly hinder my ability to perform my job effectively.

21. As a result, my ability to perform my job (which is in a highly competitive field), earn income, advance my career, and travel freely and without undue fear have been severely and adversely impacted by the arrest record.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 20 2007

Peter J. Rose, Plaintiff