UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PETER ROSE, | ) | |
|     Plaintiff | ) | |
| | ) | |
|       v. | ) | 07-CV-0926 (RWR) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
|    et al., | ) | |
|    Defendants | ) | |
| | ) | |

## FEDERAL DEFENDANTS' MOTION UNDER RULES 12(b)(1) AND 12(b)(6) TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR FAILURE TO STATE A CLAIM

The United States and the Federal Bureau of Investigation ("Federal Defendants"), through their attorney, the United States Attorney for the District of Columbia, respectfully move to dismiss the action initiated by plaintiff's complaint as to the Federal Defendants pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., for lack of subject matter jurisdiction and for failure to state a claim.

## INTRODUCTION

Asserting jurisdiction under 28 U.S.C. §§ 1331 ("Federal question"), 1343 ("Civil rights and elective franchise"), 2201 ("Creation of remedy"), 2202 ("Further relief"), 42 U.S.C. § 1983 ( "Civil action for deprivation of rights"), and the Fifth Amendment, plaintiff Rose seeks an order declaring unconstitutional Rule 118 of the Superior Court Rules of Criminal Procedure ("Sealing of arrest records.") (Complaint ¶¶ 5, 17). He also seeks an order announcing that Rose and "all other persons ever arrested under District of Columbia law who were not adjudicated to be guilty of any offense charged under that arrest are . . . entitled to have all" government arrest records destroyed or otherwise modified to remove any personal identifiers, and concomitant other relief (Complaint ¶

17).[1]  The Complaint stems from Rose's arrest and charge on January 21, 1999 on one count of

robbery stemming from a January 16, 1999 incident, a charge that was later dismissed and thereafter

succeeded by charges of simple assault and taking property without right, charges that were also

later dismissed.  Rose names as defendants the United States, the District of Columbia, the Superior

Court of the District of Columbia, and the Federal Bureau of Investigation.  Of these, the first and

the last comprise the Federal Defendants, who file the following motion to dismiss, as to them, the

action initiated by Rose's Complaint.

BACKGROUND[2]

On January 21, 1999, Peter Rose was arrested by the United States Park Police and charged

with one count of robbery.  This arrest related to a January 16, 1999 incident in which Rose and a

companion, William Natter, allegedly attacked the driver of a Red Top Taxi, Ismael Diare, and stole

his car keys.  This charge, in No. F-431-99 (D.C. Superior Court), was dismissed after a preliminary

hearing on April 1, 1999, based on a finding that the United States had failed to establish probable

cause.[3]  On April 7, 2000, Rose was charged by information, in No. M-4035-00 (Superior Court),

with one count of simple assault, in violation of D.C. Code § 22-404 (2001), and one count of taking

property without right, in violation of D.C. Code § 22-3216.  On March 9, 2001, the charges were

dismissed through the Government's entry of a *nolle prosequi* on both counts.

---

[1]    As shown below, Rule 118 has been largely supplanted by the Criminal Records
Sealing Act of 2006, D.C. Code §16-801, et seq., in particular § 16-802.

[2]    This background information and the description of the evidence adduced at the
evidentiary hearing are drawn directly from the Brief for Appellee filed on August 12, 2004 in Rose
v. United States, No. 04-CO-434 (District of Columbia Court of Appeals), a copy of which will be
provided the Court upon request.

[3]    A chronological listing of all court proceedings in No. F-431-99, through May 4,
2004, is attached as Attachment "A" hereto.

On July 11, 2001, Rose filed a Motion to Seal his arrest record, under Super. Ct. Crim. R. 118. The United States filed its opposition to this motion on November 26, 2001. On December 5, 2001, the Honorable Frederick D. Dorsey denied the Motion to Seal in a written order, finding that Rose had failed to establish by clear and convincing evidence that he did not commit the offense for which he was arrested or that the offense did not occur. Rose filed a Motion for Reconsideration on December 18, 2001, attaching several affidavits that he had not presented in his original Motion to Seal. The United States opposed the motion on February 4, 2002, but informed the Court that it agreed that Rose was entitled to a hearing.

On June 21, 2002, the Superior Court held the first of six days of evidentiary hearings on the Motion for Reconsideration. The hearing continued on July 18, August 8, September 12, September 18, and November 22, 2002. Rose called six witnesses to the stand: Sayed Massoud, Melissa Barbor, Walter Fischer, William Natter, Mark Carpenter and himself. The United States called Officer Troy Eliason and Detective Kevin Fornshill of the U.S. Park Police, and Ismael Diare. Natter and Rose testified in rebuttal. On November 22, 2002, following argument of counsel, Judge Dorsey denied the Motion for Reconsideration in an oral ruling (11/22/02 Tr. 70-91) (Attachment "B" hereto).[4] On January 9, 2003, Judge Dorsey denied plaintiff's Motion For the Court To Reconsider its Decision of November 22, 2002 (Attachment "C" hereto). After a series of motions were filed in both the Superior Court and the District of Columbia Court of Appeals ("DCCA"), the Honorable Frederick Weisberg re-entered, on March 23, 2004, the trial court's November 22, 2002 ruling so that Rose could file a timely appeal. Rose noted his appeal from that order on April 19, 2004.

---

[4]    Transcripts are referenced by date and page.

On August 4, 2005, the DCCA affirmed the Superior Court's denial of plaintiff's motion to seal. <u>Rose v. United States</u>, 879 A.2d 986 (D.C. 2005). On August 19, 2005, Rose petitioned for rehearing or rehearing en banc, attacking Rule 118's constitutionality (Petition ¶ 1("this proceeding involves a question of exceptional importance concerning the . . . Constitutionality of the standard for sealing arrest records set forth in SCR-Crim. Rule 118") & ¶¶ 12-23) (Attachment "D" hereto), and this petition was denied. There is no indication that Rose sought any review in the Supreme Court of the DCCA's decision. Finally, on September 25, 2007, more than four months after bringing his action in this Court, Rose filed, in F-431-99 and M-4035-00 in Superior Court, a seven-page Motion To Seal Publicly Available Records Regarding Arrest and Related Court Proceedings (Attachment "E"), seeking the sealing of his arrest record under the recently enacted Criminal Records Sealing Act or, in the alternative, under principles of equity.

THE 2002 EVIDENTIARY HEARING

Rose's Evidence

Rose presented six witnesses in support of his Motion to Seal. The witnesses' testimony indicated that, on January 16, 1999, at approximately 1:30 a.m., Rose and his friend, William Natter, left a Capitol Hill bar known as Bullfeathers, where they had been meeting with colleagues while having a few beers (7/18/02 Tr. 31-34). Rose had the bartender call him a cab to take him home, and a Red Top Taxi arrived soon after, driven by Ismael Diare (9/12/02 Tr. 9). When Rose and Mr. Natter got into the cab at around 1:30 a.m., Rose told the driver his address and gave directions on how to get there (7/18/02 Tr. 35). Rose noticed that Mr. Diare was going the wrong way (<u>id</u>. at 39). Rose testified that, after a number of attempts to get Diare to turn onto different streets, Rose yelled at the driver, slammed his hand on the front seat, and demanded that the cab be stopped (<u>id</u>. at 40).

Diare stopped the cab, at which point he and Rose hurled insults at one another; Rose told Diare that he was not fit to be a driver (id. at 41).

According to Rose, Diare suddenly called his dispatcher and falsely reported that he was being beaten by his passengers (7/18/02 Tr. 41). Then, without any provocation or reason, Diare turned around and punched Rose in the face with his left hand, from the front seat, knocking out Rose's contact lens (id. at 42).[5] Rose claimed that Diare pulled him over the front seat by his jacket and continued to beat him, while Natter sat in the back seat (id.). At some point, Natter got out of the cab, went to the driver's side door, and yelled at Diare to stop beating Rose (id. at 43). Rose stated that Natter never hit Diare (id.). Rose testified that Diare then got out of the cab (id.). Rose also got out of the cab, but then fell down and was assaulted some more by Diare (id.). Natter then took the keys out of the ignition of the cab and yelled to Rose (id.). Diare then suddenly stopped assaulting Rose (id.). Natter threw the keys back into the cab, and Natter and Rose ran off together (7/18/02 Tr. 45; 6/21/02 Tr. 67). Both Rose and Natter stated on numerous occasions in their testimony that neither one of them ever touched or hit Diare in any way (7/18/02 Tr. 42, 51, 65, 70-71, 74; 6/21/02 Tr. 69, 74, 77).

Rose and Natter then found another cab to take them to Rose's house (7/18/02 Tr. 47). They did not go to a police station or call the police to report the alleged assault by Diare (id.). Rose instead called the Bullfeathers bar and told them never to use Red Top Cab again, and then promptly went to bed (id.).

Rose testified that Detective Fornshill came to his house the next morning (7/18/02 Tr. 48). Rose gave a statement to the detective describing how Diare assaulted him (id. at 48-50). Rose

---

[5]    Diare later testified that he is right-handed (9/12/02 Tr. 43).

testified that the detective had his gun drawn when he knocked at the door, and was angry and confrontational while speaking to Rose (id.).

Natter testified that Diare had assaulted Rose and him (6/21/02 Tr. 64). According to Natter, neither Rose nor he touched Diare at any time (id. at 69, 74). Natter conceded that Rose and he failed to call the police about the incident when they got home (id. at 76).[6] Walter Fischer, another friend of Rose, testified about their night at the bar. Mr. Fischer stated that Rose only had a few beers to drink, and that Rose was not confrontational or angry with anyone at the bar (6/21/02 Tr. 43-51). Another friend, Mark Carpenter, testified about pictures that he took of Rose the day following the incident, as he noticed swelling around Rose's left eye (7/18/02 Tr. 4-12). Rose also called an optometrist to the stand, who testified that she examined Rose on January 23, 1999, and noticed swelling around his left eye (6/21/02 Tr. 33-43). The operations manager for Blue Top Cab, Sayed Massoud, also testified, stating that Diare had confrontations with other employees when he worked at Blue Top, whereas Rose had a reputation with his company as a long-time, valued customer who had never been a problem (id. at 22-33).[7]

---

[6] Natter's description of the events was consistent with Rose's for the most part, except that Natter testified that Rose's glasses were knocked off Rose's face when Rose was punched, which contradicted Rose's testimony that he was wearing contacts at the time. When questioned by counsel again on this matter, Natter said that he thought Rose was wearing glasses, but could not be certain (7/18/02 Tr. 64).

[7] Mr. Massoud worked for Blue Top Cab, while Diare was working for Red Top Cab at the time of this incident (6/21/02 Tr. 30-31).

6

<u>The United States' Evidence</u>

The United States presented three witnesses. Their testimony indicated that, on January 16, 1999, Rose and Natter left Bullfeathers and got into a Red Top Taxi driven by Ismael Diare (9/12/02 Tr. 9). Diare drove towards North Highland Street in Arlington (<u>id</u>. at 11). Rose lived on South Highland Street, and the two passengers told Diare that he was going the wrong way (<u>id</u>. at 11-14). Diare apologized and turned off the fare meter, as a sign to the two men that he had made a mistake and was not trying to run up his fare (<u>id</u>. at 14).

As Diare headed towards the correct address, Rose and Natter become angry and belligerent. They insulted Diare and demanded that he stop the cab (9/12/02 Tr. 15). Diare tried to explain the route he was taking, but Rose and Natter did not want to listen (<u>id</u>.). One of the men grabbed the steering wheel, forcing Diare to brake quickly and pull over to the side of the road (<u>id</u>. at 16-19). Rose and Natter began to assault Diare, so Diare called the dispatcher and pled for help (<u>id</u>. at 18).[8] As one passenger came around to Diare's driver's side door, the other passenger grabbed Diare by his neck and pinned him against the seat (<u>id</u>. at 19-20). Diare escaped into the front passenger seat (<u>id</u>. at 21). One of the passengers opened the driver's side door and punched Diare in the face and chest (<u>id</u>.). Diare kicked at the man to protect himself (<u>id</u>.).[9]

Diare got out of the cab and attempted to defend himself against Rose and Natter (9/12/02 at 22). One of the passengers grabbed the ignition key from the taxi and shouted to his companion,

---

[8]    The United States played the taped recording of this call by Diare to the dispatcher, and submitted it into evidence as Government Exhibit 3 (9/12/02, Tr. 43).

[9]    Diare was not able to identify which passenger carried out which specific attack, but he testified that both passengers attacked him both inside and outside of the cab (9/21/02, Tr. 19-22).

at which point the two men ran (id. at 23). Diare returned to his cab and spoke with his dispatcher, who sent police to meet him on the Memorial Bridge (id. at 24-25). Officer Troy Eliason promptly arrived and interviewed Diare about what had happened (8/8/02 Tr. 7). Diare was very upset and distraught over what had happened, and openly cried as he described the attack to Officer Eliason (id. at 9).

Officer Eliason wrote up a report regarding what Diare had told him (8/8/02 Tr. 24). Later that same morning, Detective Fornshill investigated the incident further, and found Rose's address and phone number from the incident report and the Haines directory (id. at 23). Detective Fornshill called Rose's home, but no one answered (id. at 24). Detective Fornshill then went to Rose's home, arriving at around 6:30 a.m. (id. at 25). Rose came to the door, and Detective Fornshill asked him what had happened the previous night (id. at 26). Rose stated that he had been attacked by Diare, and denied having Diare's keys (id. at 27). Detective Fornshill took pictures of some discoloration on Rose's face (id. at 28). The detective also noticed an abrasion on Rose's hand, but Rose would not allow Fornshill to photograph the injury (id.). Rose also refused to accompany Fornshill to the police station to give a formal statement (id. at 29). Rose stated that he would contact the detective later in the day after speaking with his lawyer (id.).

Detective Fornshill then had an hour-long conversation with Diare, who went over the details of the attack with the detective (8/8/02 Tr. 32-38). Diare filed a written complaint at the police station later that day (id. at 40). Detective Fornshill also interviewed the manager at Bullfeathers, as well as employees at Red Top Taxi (8/8/02 Tr. 30, 41). Based on his investigation, Detective Fornshill filed an affidavit in support of an arrest warrant on January 19, 1999 (id. at 43, Gov. Ex. 3). Judge Goodrich signed the warrant, finding that the affidavit established probable cause to arrest

Rose for robbery (8/8/02 Tr. 44, Gov. Ex. 3).

Judge Dorsey's November 22, 2002 Ruling

On November 22, 2002, Judge Dorsey delivered his oral ruling on Rose's December 18, 2001 Motion for Reconsideration, after listening to testimony that spanned six separate hearing dates over the course of five months. Judge Dorsey stated that the burden was on Rose to prove by clear and convincing evidence that he had not committed a crime (11/22/02 Tr. 71). The judge examined the testimony of all the witnesses, and found inconsistencies in the testimony on both sides (id.). However, the judge noted that consistency was not the only basis for credibility, and stated that Rose's description of the events was "not believable," particularly the notion that Diare would make a false call for police help and then proceed to beat up Rose without provocation (id. at 72, 88). Also damaging to the credibility of Rose's account was the fact that Rose and Natter returned home after this alleged attack and then called the bar they had been to rather than the police (id. at 87). The judge concluded that this conduct went against "common sense" and that a person could reasonably find that conduct to be inconsistent with Rose's account of the assault (id. at 87-88). Judge Dorsey concluded that Rose had simply failed to meet the burden of showing by clear and convincing evidence that he had committed no crime (id. at 90). Judge Dorsey further found that Rose did not meet even a burden of the preponderance of the evidence, ruling that, "I cannot reach the 51 percent" (id.). The Motion for Reconsideration was denied (id. at 91).

LEGISLATIVE BACKGROUND

The Criminal Records Sealing Act of 2006, D.C. Code § 16-801, et seq., became law earlier this year. Section 16-802 addresses motions for relief based on "actual innocence." It essentially replicates Rule 118 procedures except that (a) the time limits for filing are eliminated; (b) the burden

of proof is lowered to a "preponderance of the evidence" for motions filed within four years after the termination of the case (it remains "clear and convincing evidence" for motions filed after 4 years); and (c) relief can be sought following an acquittal at trial (but acquittal does not create any presumption that the defendant is entitled to relief).

Section 16-803 addresses motions for relief not based on grounds of actual innocence. In these cases, relief is far more limited than in cases of actual innocence. Even if a motion is granted under § 16-803, the records will remain available to law enforcement agencies, the prosecutors, the courts, and other agencies with a particular need to know. §16-806(b).[10]

ARGUMENT

I.    The Court Lacks Subject Matter Jurisdiction Over This Action.

The Court lacks subject matter jurisdiction over this action because it amounts to a wrongful attempt to seek review, in this Court, of the DCCA's decision affirming the denial of Rose's (second) motion to reconsider. E.g., District of Columbia v. Feldman, 460 US 462, 476 (1983).

Under the Rooker-Feldman doctrine, "federal district courts lack jurisdiction to review judicial decisions by state and District of Columbia courts." Richardson v. District of Columbia Court of Appeals, 83 F.3d 1513, 1514 (D.C. Cir. 1996) (citing Feldman, 460 US at 476, and Rooker

---

[10]    Under § 16-803, in cases involving arrests for certain "eligible misdemeanors" there is a presumption in favor of relief – the burden is on the government to demonstrate by a preponderance why relief should not be granted. § 16-803(i)(1). In cases involving arrests for felonies or "ineligible misdemeanors," there is a presumption against relief – i.e., the burden is on the movant to demonstrate by a preponderance why relief should be granted. § 16-803(i)(2). In cases involving convictions, relief is available only for "eligible misdemeanors" and felony Bail Reform Act violations. There is a presumption against relief unless the movant can demonstrate by clear and convincing evidence that it is in the interests of justice to grant relief. §16-803(i)(3).

v. Fidelity Trust Co., 263 US 413, 415 (1923)).  The doctrine applies to final state court decisions

even where, as here, it is alleged that the state court's action was unconstitutional.  Richardson, 83

F.3d at 1515; Feldman, 460 U.S. at 486 (federal district courts lack jurisdiction "over challenges to

state court decisions in particular cases arising out of judicial proceedings even if those challenges

allege that the state court's action was unconstitutional"); see also Exxon Mobile Corp. v. Saudi

Basic Industries Corp., 544 U.S. 280, 284 (2005) (Rooker-Feldman doctrine applies to "cases

brought by state-court losers complaining of injuries caused by state court judgments rendered

before the district court proceedings commenced and inviting district court review and rejection of

those judgments").  Dissatisfied with the result in the District of Columbia court system, plaintiff

elects to begin anew in this Court, suing the Superior Court and openly challenging the DCCA's

decision on appeal (Complaint ¶12).[11]  Because plaintiff's complaint serves as the functional

equivalent of an appeal from a state court, re-alleging, in particular, that Rule 118 is

unconstitutional, this Court is without jurisdiction to entertain it.  E.g., Feldman, 460 U.S. at 476;

Brown v. Chastain, 416 F.2d 1012, 1013-14 (5th Cir. 1969) (en banc) (state courts competent to

decide questions arising under the Constitution; federal courts will not provide a forum in which

disgruntled parties can relitigate federal claims presented to and decided by state courts).

II.    The Doctrine of Res Judicata Bars Plaintiff's Claims

       As a wholly separate matter, the doctrine of res judicata bars this suit against the Federal

Defendants.  Under this doctrine, also known as claim preclusion, a final judgment on the merits of

---

[11]    Plaintiff complains that he "appealed the denial" of his motion to seal but that the
DCCA affirmed "even though . . . its . . . opinion acknowledged that the trial Judge stated
unequivocally that 'there is no question . . . [that] there is not proof beyond a reasonable doubt [to
support a conviction of the Appellant]'" (Complaint ¶ 12) (brackets in original).

an action precludes the parties from relitigating issues that were or could have been decided finally. Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 376 n.1 (1985) (purpose of claim preclusion doctrine is to prevent "litigation of matters that should have been raised in an earlier suit"); Allen v. McCurry, 449 U.S. 90, 94 (1980) ("[u]nder res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action"); Stutsman v. Kaiser Foundation Health Plan, 546 A.2d 347, 369 (D.C. 1987) ("the doctrine of claim preclusion will operate to prevent the same parties from relitigation of not only those matters actually litigated but also those which might have been litigated in the first proceeding") (internal quotations omitted).[12]

Plaintiff has had, in the D.C. court system, a full and fair opportunity to litigate any and all issues concerning his arrest record, in a proceeding that consumed six separate hearing dates in the Superior Court, spread over five months, followed by briefing, argument, and decision in the District of Columbia Court of Appeals. Plaintiff was free, of course, to challenge the constitutionality of Rule 118 in the D.C. state courts, and did so in his petition for rehearing and rehearing en banc. Moreover, Rose "could have" challenged the constitutionality of Rule 118 before the Superior Court, and then raised it on appeal in the DCCA in his opening brief. The propriety and legality of the maintenance of plaintiff's arrest record having been extensively, even exhaustively, litigated as plaintiff saw fit, and a final judgment having been entered, plaintiff is barred from relitigating in this forum that which he had a full and fair opportunity to litigate in another. E.g., McCurry, 449 U.S. at 94 ("final judgment on the merits . . . precludes the parties or their privies from relitigating issues

---

[12]    As an agency of the United States, the FBI should be considered in privity with the United States. See Jefferson Sch. of Soc. Science v. Subversive Activities Control Bd., 331 F.2d 76, 82- 83 (D.C. Cir. 1963) (school with identity of interest with Communist Party was estopped from relitigating question whether Communist Party was a Communist-action organization within Subversive Activities Control Act). Plaintiff is therefore equally precluded from bringing this litigation against the FBI.

that were *or could have been raised* in that action") (emphasis added); <u>Apotex v. FDA</u>, 393 F.3d 210, 217-18 (D.C. Cir. 2004) (barring further claims based on the same "nucleus of facts"); <u>Taylor v. Blakely</u>, 490 F.3d 965, 969-70 (D.C. Cir. 2007), <u>pet. for cert. filed</u>, No. 07-371 (Sep. 17, 2007); <u>Stutsman</u>, 546 A.2d at 370 ("that Stutsman brought his second action under a different theory, wrongful death, which had not been actually adjudicated in the prior . . . action, is irrelevant[;] [i]t is the factual nucleus, not the theory upon which plaintiff relies, which operates to constitute the cause of action for claim preclusion purposes") (citing <u>Page v. United States</u>, 729 F.2d 818, 820 (D.C. Cir. 1984) (prior judgment bars "any further claim based on the same nucleus of facts") (internal quotations omitted)); <u>see</u> <u>also</u> <u>Williams v. Board of Trustees of Mount Jezreel Baptist Church</u>, 589 A.2d 901, 906 (D.C. 1991) ("A final judgment on the merits 'embodies all of a party's rights arising out of the transaction involved, and a party will be foreclosed from later seeking relief on the basis of issues which might have been raised in the prior action.'") (quoting <u>Stutsman</u>, 546 A.2d at 370).   For these reasons, plaintiff's action against the Federal Defendants should be dismissed.

III.   There Is No Basis For Finding Rule 118 Unconstitutional or Expunging Rose's Criminal Record

   To invoke the Due Process Clause, a plaintiff must first demonstrate that there has been a deprivation of a life, liberty, or property interest.  <u>Matthews v. Eldridge</u>, 424 U.S. 319, 332 (1976). Only if he can make this showing need the Court even address the question of "how much process is due." <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532, 541 (1985).  Rose claims he has suffered "great damage to his life, liberty and property" due to his arrest record (Complaint ¶ 14).  In particular, "right in front of Mr. Rose's" client(s), Rose alleges he was denied access to the White House notwithstanding an invitation from the President, delayed and detained at the entrance to a meeting at the Office of Management and Budget, and at the entrance to a meeting at the Old Executive Office Building; and was obliged to decline invitations to meet with the President and attend other meetings "with important officials in secure locations" for fear of again being detained

and embarrassed (Complaint ¶ 13).    Further, Rose claims he was disqualified from the Transportation Security Administration Registered Traveler Pilot Program, which is designed to expedite the airport screening process for frequent travelers; and experienced significant delay in the renewal of his security clearance, and "heightened fear and apprehension" whenever he has come in contact with law enforcement personnel (id.).  Finally, Rose contends he was embarrassed when a colleague happened to come across his arrest record in the Superior Court's public database (id.). As a result, Rose conclusorily claims, his "ability to perform his job, earn income, advance in his career, and travel freely and without undue fear have been severely . . . impacted by his arrest record" (Complaint ¶ 14).[13]

This catalog of sundry embarrassments and inconveniences does not make out, much less demonstrate, a deprivation of a constitutionally protected life, liberty or property interest.  Rose has no life, liberty, or property interest in connection with his arrest record.  See Siegert v. Gilley, 500 U.S. 226, 232-35 (1991) (former government employee's allegation that former supervisor, in response to request for information on former employee's job performance, wrote defamatory letter with malice and in bad faith did not make out violation of any clearly established constitutional right; injury to reputation by itself not a protected "liberty" interest) (citing Paul v. Davis, 424 U.S. 693, 708-09 (1976) (injury to reputation, standing alone, not a "liberty" interest protected under Fourteenth Amendment)); United States v. Linn, 513 F.2d 925, 928 (10th Cir. 1975) (rejecting claim that retention of arrest records was "invasion of [the] right to privacy"; "acquittal, standing alone, is not in itself sufficient to warrant an expunction of an arrest"); Rowlett v. Fairfax, 446 F. Supp. 186, 187-89 (W.D. Mo. 1978) (although charges on which petitioner was arrested were dismissed

---

[13]    In addition, plaintiff lacks standing to assert on behalf of any person other than himself any claimed injury flowing from Rule 118 (Complaint ¶ 17); accordingly these other would-be claims should be dismissed.  E.g., GrassRoots Recycling Network, Inc. v. EPA, 429 F.3d 1109, 111-12 (D.C. Cir. 2005) (to establish constitutional standing, plaintiffs must show three elements: (1) injury in fact, (2) causation, and (3) redressability) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

shortly after his arrest, no constitutional or statutory interest supported expungement from FBI "rap" sheet of two entries, including fingerprint records, based on arrest); United States v. Singleton, 442 F. Supp. 722, 724 (S.D. Tex. 1977) (expungement of arrest records of police officers arrested for illegal wiretapping and thereafter acquitted on all charges was matter for Congress, not court, in absence of unusual facts warranting departure from general rule that power to expunge an arrest record is a narrow one that should be reserved for the extreme case, notwithstanding officers' claims that maintenance of arrest records would "inhibit future employment opportunities and injure [their] reputations"); Dawkins v. United States, 535 A.2d 1383, 1386 n.3 (D.C. 1988) (rejecting claim that "issues relating to sealing of arrest records" "somehow implicate [arrestee's] privacy or liberty interests and therefore require a due process hearing" (citing Paul v. Davis, 424 U.S. at 701).

Second, even assuming arguendo that Rose had a protected life, liberty or property interest at stake, he received whatever process may have been due.  See Mathews v. Eldridge, 434 U.S. 319, 333 (1976) ("fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'").  Rose had several days of evidentiary hearing proceedings before a Superior Court judge at which he adduced evidence, examined several witnesses called on his behalf, cross-examined the government's witnesses, and argued the case through counsel.  His various motions to reconsider also were heard and considered, and, when he missed an appeal deadline when predecessor counsel fell ill, the Superior Court vacated and reentered its final order well over a year later so that he might pursue an appeal.  Rose had another full and fair opportunity to pursue his case on appeal in the DCCA, and has only himself to blame for not seeking further review in the Supreme Court.  This "process" was more than sufficient.  E.g., Gilbert v. Homar, 520 U.S. 924, 930 (1997) (due process is "flexible and calls for such procedural protections as the particular situation demands") (internal quotations omitted); District of Columbia v. Hudson, 404 A.2d 175, 179 n.6 (D.C. 1979) (en banc) ("we conclude the presumption of innocence in a criminal prosecution has no place in a civil proceeding in which the movant is seeking equitable relief [to expunge arrest records] and, therefore, cannot be used to shift the burden of proof from the movant

to the government") (citing <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979)).

In any event, there is no other basis for expunging defendant's criminal record.  He has cited no statutory authority for doing so.  <u>See</u> <u>Doe v. Webster</u>, 606 F.2d 1226, 1231 (D.C. Cir. 1979) ("[e]ven individuals who were never convicted are not entitled to the expungement of their arrest records as a matter of course"); <u>United States v. Shrivastava</u>, Cr. No. 71-1976 (TFH), at 1- 2 (D.D.C. Jun. 4, 2002) (Attachment "F") (citing <u>Webster</u>); <u>see also</u> <u>Coleman v. Department of Justice</u>, 429 F. Supp. 411, 413-14 (N.D. Ind. 1979) ("great weight of authority holds that an individual's [FBI] 'rap sheet' can only be expunged under extraordinary circumstances"; granting government's motion to dismiss).[14]

While this Court has inherent, equitable expungement power, <u>see, e.g.</u>, <u>Livingston v. United States Department of Justice</u>, 759 F.2d 74, 78 (D.C. Cir. 1985); <u>Webster</u>, 606 F.2d at 1230; compare <u>United States v. Meyer</u>, 439 F.3d 855, 860-61 (8th Cir. 2006) (district court lacks power to expunge a criminal record based solely on equitable grounds, citing cases), plaintiff has failed to make the showing required for such an exercise of the Court's power:  that it is "necessary and appropriate in order to preserve basic legal rights."  <u>Sullivan v. Murphy</u>, 478 F.2d 938, 968 (D.C. Cir. 1973); <u>Livingston</u>, 759 F.2d at 78; <u>United States v. Smith</u>, 940 F.2d 395, 396 (9th Cir. 1991) ("[c]ourts which have recognized an equitable power to expunge [arrest records] have unanimously observed that it is a narrow power, appropriately used only in extreme circumstances"; vacating district

---

[14]    Dismissal of an indictment alone does not constitute a concession of innocence. <u>United States v. Bagley</u>, 899 F.2d 707, 708 (8th Cir. 1990); <u>District of Columbia v. Houston</u>, 842 A.2d 667, 673 (D.C. 2004) (fact that case is no-papered does not mean defendant is entitled to relief under Rule 118).  Moreover, given the manner in which Rose has conducted his litigation, <u>e.g.</u>, filing a largely duplicative suit in this Court to seek "review" of the District of Columbia Court of Appeals decision (Complaint ¶ 12), and then maintaining this action after filing yet another motion to seal back in Superior Court, leads to the conclusion that such an equitable remedy should be denied him. <u>See, e.g.</u>, <u>Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.</u>, 324 U.S. 806, 814-15 (1945); <u>Cotton v. District of Columbia</u>, 421 F. Supp. 2d 83, 86 (D.D.C. 2006) ("Duplicative cases suing government officials in their official capacity are [a] 'redundant and inefficient use of judicial resources.'") (quoting <u>Robinson v. Dist. of Columbia</u>, 403 F. Supp. 2d 39, 49 (D.D.C. 2005)).

court's order of expungement); <u>Saidi v. Washington Metropolitan Area Transit Authority</u>, 928 F. Supp. 21, 29 (D.D.C. 1996) ("In the District of Columbia, '[d]ismissal of the [criminal] complaint, without more, will not justify expungement of the arrest record.'") (quoting <u>Livingston</u>, 759 F.2d at 78 n.30); <u>Teachey v. Carver</u>, 736 A.2d 998, 1007 (D.C. 1999) ("[e]xpungement is a drastic remedy" "authorized under narrow circumstances where injustice would otherwise result").[15]  Rose has made no such showing.  For these reasons, he has failed to state a claim for relief, and his complaint against the federal defendants should be dismissed.[16]

IV.    <u>The Complaint Is Otherwise Defective:  Plaintiff's § 1983 Claims Cannot Be Maintained</u>

To the extent Rose brings his § 1983 claims against the Federal Parties, they cannot be sustained.

A.    <u>Sovereign Immunity Bars § 1983 Claims Against The Federal Defendants.</u>

Section 1983 does not waive federal sovereign immunity for the federal government or a federal agency.  <u>Settles v. U.S. Parole Commission</u>, 429 F.3d 1098, 1105-06 (D.C. Cir. 2005) (sovereign immunity bars claims under 42 U.S.C. § 1983 against a government agency); <u>Epps v. Howes</u>, 2007 WL 2248072, *3 (D.D.C. July 31, 2007) ("Just as DOJ and the Parole Commission are protected by sovereign immunity [from suit under 42 U.S.C. § 1983], so too is the United

---

[15]    <u>District of Columbia v. Hudson</u>, 404 A.2d 175 (D.C. 1979) (<u>en banc</u>) involved a government appeal from equitable orders requiring the sealing of arrest records.  That court noted several potential uses for such records, including release condition determinations, parole matters, plea bargaining and sentencing.  <u>Id.</u> at 178 (citing <u>Villines v. United States</u>, 312 A.2d 304 (D.C. 1973) (proper to consider prior arrests in ruling requests for pretrial release and release pending appeal)).

[16]    In the event the Court does not dismiss this case outright, given Rose's September 2007 filing of another motion to seal in Superior Court, it should stay this action as a matter of comity.  <u>See generally</u> <u>Wainwright v. Sykes</u>, 433 U.S. 72, 80-81 (1977) (discussing principles of comity, under which  a federal court should "stay" its "hand" pending consideration of a habeas issue pending a state trial).

States."). Only those acting "under color of" state law are within the scope of § 1983, McCord v. Bailey, 636 F.2d 606, 613 (D.C. Cir. 1980), and neither the United States nor its agencies are such actors. Daly-Murphy v. Winston, 837 F.2d 348, 355 (9th Cir. 1987) (federal agency and officers); cf. Williams v. United States, 396 F.3d 412, 413 (D.C. Cir. 2005) (federal officer).[17]

Thus, § 1983 does not generally apply to federal agencies acting under color of federal law. Rather, by its terms, § 1983 applies only to actions under color of state law and does not ordinarily provide a basis for claims against federal agencies. Accordingly, no § 1983 claim can be maintained against either of the Federal Defendants.

B.    The Federal Defendants Are Not "Persons" For Purposes of § 1983.

Not only has there been no waiver of sovereign immunity, Settles, but the Federal Government is not a "person" within the meaning of Section 1983, which permits suit against a "person" acting under color of law of any state. Neither the United States nor the FBI is a "person" for purposes of this statute; neither can be sued under § 1983. See Al Fayed v. C.I.A., 229 F.3d 272, 274 (D.C. Cir. 2000) (government is not a "person" absent affirmative evidence in statute of intent to include sovereign government within term); Hindes v. F.D.I.C., 137 F.3d 148, 158 (3d Cir. 1998) ("We find no authority to support the conclusion that a federal agency is a 'person' subject to section 1983 liability, whether or not in an alleged conspiracy with state actors. We, therefore, hold that federal agencies are not 'persons' subject to section 1983 liability."); Hoffman v. U.S. Dep't of Housing & Urban Dev., 519 F.2d 1160, 1165 (5th Cir. 1975) ("a federal agency is also excluded from the scope of section 1983 liability"); Elliott v. FDIC, 305 F. Supp.2d 79, 84-85 (D.D.C. 2004) (federal agency is "not a person subject to liability under § 1983"). Thus, for this additional reason, no § 1983 claim can lie against the Federal Defendants.

---

[17]    The only possible exception is where there is a conspiracy between state and federal officials resulting in an abuse of authority derived from state law. Kletschka v. Driver, 411 F.2d 436, 448 (2d Cir. 1969). Plaintiff has not alleged such action here.

CONCLUSION

For the foregoing reasons, the Federal Defendants respectfully request that the Court dismiss the Complaint against the Federal Defendants. Proposed alternative orders are submitted herewith.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 490-610

ROBERT D. OKUN
CHIEF, SPECIAL PROCEEDINGS DIVISION
D.C. Bar No. 457078

/s/ Thomas S. Rees
Assistant United States Attorney
D.C. Bar 358962
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-4882

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Federal Defendants' Motion to Dismiss, and a copy of a proposed order, have been served via the Court's electronic filing system on Bernard A. Solnik, Esq., 11 N. Washington Street, Suite 640, Rockville, MD 2085, and on Assistant Attorney General (District of Columbia) Jayme Kantor, this 12th day of October, 2007.

/s/ Thomas S. Rees
THOMAS S. REES
Assistant United States Attorney

ATTACHMENT "A"

[chronological listing of all court proceedings through May 4, 2004 in F-431-99 (D.C. Superior Court)]

Judge Roberts
07-CV-0926

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CRIMINAL DIVISION

United States

      V.

Peter Rose

Case No   F431-99

Appeal File Date    4/19/04

Pages 4

### The following is a chronological listing of all Court Proceedings in this case

| DATE | ENTRY | JUDGE |
|---|---|---|
| 1/21/99 | C10 tape, Lockup L-55, Counsel J. O'Dea #211128, Defendant DOB 6/15/60, charged in Count A for robbery, assault and TPWR. Continued to 2/11/99 for preliminary hearing. Defendant on personal recognizance, advised of penalties for failure to appear. | Melendez |
| 2/11/99 | Courtroom 119, Counsel not present, Defendant present. Defense counsel out sick. Request for continuance granted. Continued date in Count A for 2/19/99 for preliminary hearing. Defendant advised of penalties for failure to appear. Defendant not in custody. | Macaluso |
| 2/19/99 | Courtroom 120 tape, Counsel present, Defendant present. Mutual continuance granted by the court in Count A for preliminary hearing conference on 2/26/99 in #119. Defendant not in custody. Personal recognizance remains. Defendant advised of penalties for failure to appear. | Lee |
| 2/26/99 | Courtroom 119 tape. Counsel not present. Defendant present. Court grants defense counsel request for continuance. Case continued in Count A for preliminary hearing conference in #119 on 3/5/99. Defendant not in custody. PR remains. Defendant advised of penalties for failure to appear | Macaluso |
| 3/5/99 | Courtroom 119. Counsel not present. Defendant not present. Defense counsel out ill. Case was continued in Count A for 3/12/99 for preliminary hearing in #119. Defendant not in custody, on PR. | Macaluso |
| 3/12/99 | Courtroom 119. Counsel present, defendant present. Defense counsel request for continuance granted. Continued date set for 3/18/99 in Count A for preliminary hearing in #119. Defendant on PR, not in custody, warned of penalties for failure to return. | Macaluso |
| 3/18/99 | Courtroom 120. Counsel present, defendant present. Request for continuance by defense counsel granted. Case continued for preliminary hearing on 4/1/99 in Count A in #119. Defendant not in custody, on PR, warned of penalties for failure to return. | Lee |

Continuation of chronological listing Page 2

| DATE | ENTRY | JUDGE |
|---|---|---|
| 4/1/99 | Courtroom 119 tape. FINAL DISPOSITION. Counsel present, defendant present. Preliminary hearing held. No probable cause found. Count A disposed. | Eilperin |
| 4/6/00 | Case reassigned to misdemeanor calendar #4, Judge Milliken. Government files misdemeanor information Counts B, C. Case was continued for 4/7/00 for APR in Courtroom C-10 for Counts B and C. | Misdemeanor/ traffic branch |
| 4/7/oo | C-10 tape. Counsel present, defendant present. Defendant arraigned. Plea not guilty. Case continued for ATR in Courtroom 302 for 6/29/00 in Counts B, C. Defendant released and warned of penalties for failure to return. Defendant not in custody. | Diaz |
| 6/8/00 | Defendant's motion to compel | Misdemeanor Branch |
| 6/21/00 | Government's motion for continuance filed. | Misdemeanor Branch |
| 6/23/00 | Government unopposed motion for continuance granted. Parties notified through chambers. Continued date for SH in #302 on 6/29/00. | Milliken |
| 6/29/00 | Courtroom 301. Counsel present, defendant present. SH held. Trial date set for 9/21/00 in Counts B, C in #302. | Turner for Milliken |
| 9/21/00 | Courtroom 302. Counsel present, defendant present. Case continued for non-jury trial on 11/13/00 in Counts B, C in #302. Defendant on PR, not in custody, warned of penalties for failure to return. | Turner for Milliken |
| 11/13/00 | Courtroom 302 tape. Counsel not present, defendant present. Co-counsel stated that Attorney O'Dea was ill. Judge spoke attorney. O'Dea on telephone. Case continued in Counts B, C for trial on 12/5/00 in Courtroom 302. Defendant on PR, not in custody, warned of penalties for failure to return. | Milliken |
| 12/5/00 | Courtroom 302 tape. Counsel present, defendant present. Case set on the STET DOCKET; case continued for status in Counts B, C on 3/9/01 in #212. Defendant not in custody, on PR, warned of penalties for failure to return. | Milliken |
| 3/9/01 | Courtroom 211 tape. Counsel present. Defendant not in custody. Counts B, C. | Dorsey |
| 7/19/01 | Motion to seal record, filed 7/11/01. Forwarded to Judge Dorsey | Felony Branch |
| 8/21/01 | Copies mailed to parties indicated on 8/20/01 | |
| 10/22/01 | Government's motion for enlargement of time to respond to Defense motion to seal granted. Response due by 11/21/01. See signed order attached hereto. | Dorsey |
| 11/1/01 | Copies mailed to all parties | |
| 11/30/01 | Government enlargement of time filed 11/26/01 | |
| 11/30/01 | Government opposition filed 11/26/01 | |

Continuation of chronological listing Page 3

| DATE | ENTRY | JUDGE |
|---|---|---|
| 12/6/01 | Government's motion to late file response to Defendant's motion to seal granted. Defendant's motion to seal denied. See signed orders attached hereto. Copies mailed to parties indicated above on | Dorsey |
| 12/10/01 | Defendant's opposition to motion for leave to late file | |
| 1/2/02 | Motion for reconsideration received and filed. Case forwarded to Judge Dorsey. | |
| 1/14/02 | Government ordered to respond to Defendant's motion for reconsideration on or before 2/11/02. See signed order attached hereto Copies mailed to parties indicated above on 1/17/02. | Dorsey |
| 2/21/02 | Government opposition filed 2/4/02 | |
| 2/26/02 | Government's motion for continuance filed | |
| 2/27/02 | Defendant's motion for reconsideration of motion to seal set for 3/1/02 at 10:30 a.m. See signed order attached hereto. | Dorsey |
| 2/27/02 | Defendant's motion for reconsideration of motion to seal hearing rescheduled for 4/1/02 at 9 a.m. See signed order attached hereto. Copies mailed to parties indicated above on 2/28/02 | Dorsey |
| 3/28/02 | Government's motion to continue hearing granted. Case continued for status. See signed order attached hereto. | Dorsey |
| 4/1/02 | Courtroom 210 tape. Counsel present, defendant present. Case continued for motion of expungement for 6/21/02, status hearing in Counts B, C in #210. Defendant not in custody, on PR, warned of penalties for failure to return. | Dorsey |
| 6/21/02 | Courtroom 210 tape, Court reporter C. Franklin. Motion of expungement hearing held in Counts B, C. Motion hearing continued to 7/18/02 in #210. Defendant on PR, not in custody. | Dorsey |
| 7/18/02 | Courtroom 210 tape, Court reporter Kaczorowski. Counsel present, defendant present. Motion-to-expunge hearing resumed in defense case. Motion continued to 8/8/02 at 2 p.m. in #210, Counts B, C. Defendant not in custody. | Dorsey |
| 8/8/02 | Courtroom 210 tape, Court reporter Hunt. Counsel present. Motion to expunge hearing resumed. Case continued for motion hearing at 2 p.m. on 8/27/02, Counts B, C in #210. | Dorsey |
| 8/27/02 | Courtroom 210 tape, Court reporter K. Jackson. Counsel present, defendant present. Motion-to-expunge hearing resumed. Case continued for motion hearing at 2 p.m. on 9/18/02 in #210, Counts B, C. | Dorsey |
| 9/12/02 | Courtroom 210 tape, Court reporter Salazar. Counsel present, defendant present. Motion to expunge hearing resumed. Case continued. Disposed: Count A Closed. Count B show cause. | Dorsey |
| 9/18/02 | Courtroom 210 tape, Court reporter Jackson. Counsel present, defendant present. Stipulation entered. Motion hearing to expunge continued for 10/10/02 in #210, Counts B, C. Counts A and C disposed, Count B show cause disposed | Dorsey |
| 10/10/02 | Courtroom 210 tape. Counsel present, defendant present. Motion-to-expunge hearing continued to 11/22/02 I Counts B, C in #210. | Dorsey |

Continuation of chronological listing Page 4

| DATE | ENTRY | JUDGE |
|---|---|---|
| 11/22/02 | Courtroom 210 tape. Counsel present, defendant present. Motion for reconsideration is denied. | Dorsey |
| 1/6/03 | Government's motion for leave to file opposition. Government's opposition filed. SP Proc BR | |
| 12/3/02 | Motion to reconsider filed and forwarded to Judge Dorsey | Case management |
| 1/10/03 | Defendant's motion to reconsider denied. See signed order attached hereto. | Dorsey |
| 1/13/03 | Copies mailed to parties indicated above on 1/13/03, | SP Proc BR |
| 5/16/03 | Motion to re-enter order denying motion to reconsider motion to seal arrest record and filed 5/8/03 and forwarded to Judge Weisberg chambers. Reconsider is hereby vacated; and further ordering that defendant's motion for reconsideration is hereby denied. (Please see entire order filed herein.) | Weisberg |
| 6/9/03 | Notice of appeal filed 6/6/03 | |
| 7/21/03 | NOA filed 6/6/03 and received 6/10/03. | ACO |
| 9/16/03 | Appeals Record certified to DCCA | ACO |
| 4/7/04 | Judgment/order dated 3/24/04 and mandated dated 3/25/04 filed from the D.C. Court of Appeals dismissing the appeal in this case. | Case Management |
| 4/27/04 | Copy of order mailed to parties on this date | SP Branch |
| 4/26/04 | Court grants defendant's motion to correct order vacating and reentering order denying motion for reconsideration of motion to seal arrest record nunc pro tunc to 3/23/04. Order filed herein. | Weisberg |
| 4/30/04 | Notice of appeal filed 4/19/04 | CMB |
| 5/4/04 | NOA filed 4/19/04 and record 4/30/04. NOA mailed to interested parties 5/4/04. | ACO |

ATTACHMENT "B"

[Judge Dorsey's November 22, 2002 oral ruling at conclusion of hearings on Rose's December 18, 2001 Motion For Reconsideration in F-431-99 (D.C. Superior Court) (pages 1-2, 69-92 of November 22, 2002 Transcript)]

Judge Roberts
07-CV-0926

2003R02025

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

```
                              )
UNITED STATES OF AMERICA      )
                              )   Criminal Action No.:
            vs.               )         F-431-99
                              )
PETER ROSE,                   )
                Defendant     )
                              )
```

Washington, D. C.

Friday, November 22, 2002

The above-entitled action came on for a motion hearing before the Honorable FREDERICK DORSEY, Associate Judge, in Courtroom Number 210, commencing at 2:38 p.m.

THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN OFFICIAL REPORTER, ENGAGED BY THE COURT, WHO HAS PERSONALLY CERTIFIED THAT IT REPRESENTS THE TESTIMONY AND PROCEEDINGS OF THE CASE AS RECORDED.

APPEARANCES:

On Behalf of the Government:

NADIR MOHANTY, Esquire
Assistant United States Attorney

On Behalf of the Defendant:

JAMES O'DEA, III, Esquire
1111 Fourteenth Street, N.W.
Suite 1000
Washington, DC  20005

KATHY E. JACKSON
Official Court Reporter              (202)879-1064

1

<u>TABLE OF CONTENTS</u>

2

<u>INDEX OF EXAMINATION</u>

3

<u>WITNESSES</u>

4

<u>On behalf of the Defendant:</u>

| | Direct | Cross | Re Direct | Re Cross |
|---|---|---|---|---|
| WILLIAM HENRY NATTER | | | | |
| By Mr. O'Dea | 4 | | | |
| By Mr. Mohanty | | 17 | | |
| By Mr. O'Dea | | | 21 | |
| | | | | |
| PETER JEROME ROSE | | | | |
| By Mr. O'Dea | 23 | | | |

5

6

7

8

9

10

<u>INDEX OF EXHIBITS</u>

11

<u>Received</u>

12

On behalf of the Defendant:
  Number 10A (photograph)                29
  Number 10B (photograph)                29
  Number 10C (photograph)                29
  Number 10D (photograph)                29

13

14

15

16

<u>INDEX OF MISCELLANY</u>

17

<u>Page</u>

18

Argument on behalf of the Defendant................ 29

19

Argument on behalf of the Government.............. 50

20

Rebuttal Argument on behalf of the Defendant....... 65

21

Court's Ruling................................... 70

22

Certificate of Court Reporter..................... 93

23

24

25

2

1    convincing, objective evidence in this case is that

2    Mr. Rose was assaulted.

3              There is no evidence of Mr. Diare being

4    assaulted.  There is evidence of Mr. Diare acting in

5    an excited manner.  There is past history in this

6    area.  Could deem to be a little out of date.

7              MR. MOHANTY:  Objection:

8              THE COURT:  Sustained.  Let's move on,

9    Mr. O'Dea.

10             MR. O'DEA:  And I submit to the Court that

11   the evidence is clear that Mr. Rose committed neither

12   assault, nor taking property without right, nor

13   robbery with force and violence.  None of those crimes

14   occurred vis-a-vis Mr. Rose.

15             It is clear that Mr. Rose was assaulted.  It

16   is clear that Mr Rose was injured.  There is no

17   evidence, except Mr. Diare's statement, that Mr. Rose

18   struck him.

19             There is no objective evidence.  There is no

20   medical evidence.  There is no markings or tearings in

21   the car.  There is no evidence of anybody damaging the

22   vehicle, damaging Mr. Diare's clothing, doing anything

23   that would indicate objectively that he had, in fact,

24   been assaulted.

25             There is evidence objectively that Mr. Rose

1    had been assaulted.  There is no evidence that

2    Mr. Rose any time attempted to take any object from

3    Mr. Diare.  That's what he was charged with.

4            All of the crimes in this case, Mr. Rose has

5    presented clear and convincing evidence he didn't

6    commit them, but was the victim of them.

7            THE COURT:  The backdrop of the case.  This

8    is a --

9            This is not a situation, if you will, in

10   which nothing happened; that is to say that either the

11   incident, however it broke down, didn't occur; or, the

12   people identified to having participated in the

13   incident actually weren't involved in the incident.

14   So let's put that out of the way.

15           Mr. Diare, Mr. Natter and Mr. Rose were, in

16   fact, in a cab on that morning, on a highway in the

17   District of Columbia, in the early morning hours of, I

18   believe it's the 19th or the 16th.

19           MR. O'DEA:  16th, Your Honor.

20           THE COURT:  16th of January of '99.  No

21   question as to identity.  No question as to

22   jurisdiction.  Happened in D.C.  No question that

23   something happened.

24           The issue is whether or not based on the

25   information that was then available -- and arguably is

70

1    now available, but I'm not real clear about that one
2    -- whether or not there was evidence to indicate that
3    the defendant committed a crime at that time and in
4    that place.  Or phrased more correctly, as Mr. O'Dea
5    said, that it is clear and convincing that he did not
6    commit that crime at that place.

7           It's interesting because in addition to the
8    fact that he has a burden, he has a burden which is
9    sometimes more difficult because it's a burden to
10   prove the negative as opposed to the positive.

11          There is a -- there is an allegation by both
12   sides that the testimony with respect to the other
13   side is not to be credited.  And both sides seem to
14   feel very strongly about that.  And both sides feel
15   apparently equally strongly that the testimony
16   proffered by their side is totally without doubt,
17   without deficiency, without question.

18          I can tell you that I'm not concerned about
19   this being one of the few cases in which I am
20   convinced that everybody or anybody told exactly what
21   happened exactly the way it happened.  I don't have to
22   worry about that because I don't think that is true.

23          Mr. Diare, as has been shown by the
24   evidence, has made inconsistent statements with
25   respect to lots of things:  Locations, times,

statements, behaviors, lots of things.

Mr. Rose has made lots of statements, none of which, as I recall -- well, let me put it another way; I won't say "none of which" -- are clearly not subject to the level and extent of inconsistency as was demonstrated by Mr. Diare.

And clearly, Mr. Natter also did not make inconsistent statements to the extent that we saw in evidence in this case.

So if we determine credibility by the consistency of one's testimony, we could probably get to "clear and convincing" without a whole lot of difficulty, except that that's not the only basis upon which credibility must be determined, as the parties know.

Mr. O'Dea says that there's no evidence, no physical, objective evidence that Mr. Rose struck Mr. Diare.

Well, yes, there is.  Mr. Rose was described as having bruises to his knuckles on the morning following the incident.  The last I heard, whether it is conclusive or not, that certainly is physical evidence that would corroborate an allegation that he had struck somebody.  It's objective; it's physical; and, it's evidence.

1          There is evidence that as a result of the

2     attack by Mr. Diare, Mr. Rose lost a contact lens.  Of

3     course, there's also testimony that at the time he was

4     struck by Mr. Diare, he was wearing glasses.

5          So, no, it's not some simple question about

6     whether or not two respected citizens of our community

7     are to be believed over a recent immigrant with a

8     history of violence; a taxi cab driver, no less, who

9     apparently is prone to driving people several miles

10    out of their way in the course of doing his job.  No,

11    this isn't about all that.

12         This is about whether or not, as you listen

13    to the testimony, as you observe the witnesses, you

14    have a sense of credibility in terms of what makes

15    sense, what people appear to be truthful about or

16    forthright about or not.  That's what this is about.

17         So really, while it's important, I think,

18    for someone to decide whether or not the detective,

19    when questioning a suspect with as little information

20    as he had, would pull a gun while knocking on a door,

21    might be something for his department to look into, it

22    seems to me it has absolutely nothing to do with what

23    happened in that cab.

24         Now here's what we know about what happened

25    in the cab.  We know that Mr. Diare did not take an

1    appropriate route to deposit Mr. Natter and Mr. Rose

2    at their objective location.  We know that.  Why?

3    Because it is uncontroverted.

4           We also know that that started with an issue

5    of concern and escalated to unacceptable behavior as

6    far as the riders were concerned.  That is to say, it

7    was clear that at some point, the riders in the cab

8    concluded that this ride had gone out of the way long

9    enough.  No question about that.  That's

10   uncontroverted.

11          Well, this is where I guess fact finding

12   comes into play.

13          Mr. Rose contends that by virtue of his

14   annoyance with being driven out of the way, even

15   though Mr. Diare concedes that he was wrong,

16   Mr. Diare's response to that was to punch Mr. Rose in

17   the face.  Mr. Rose has done nothing except asked to

18   be taken where he has a right to be taken in the most

19   direct route; that's all he's done.

20          He hasn't been hostile.  He hasn't been

21   negative.  As a matter of fact, he's virtually ignored

22   him.  He's busy talking to Mr. Natter in the back seat

23   catching up on old times.

24          But the mere confrontation as to being taken

25   out of his way, slamming the back of the seat causes

74

1    Mr. Diare to, while driving, turn and punch Mr. Rose
2    in the face with his left hand.

3    But that's not enough because Mr. Rose has
4    not done anything even now.  Mr. Diare pulls Mr. Rose
5    from the back seat into the front seat and begins to
6    pummel him.

7    According to Mr. Natter, at no point is
8    Mr. Rose striking Mr. Diare.

9    Now based solely on the confrontation, that
10   is to say, I'm out of the cab right now, he not only
11   strikes him in the face; he not only pulls him across
12   the seat.  But he also gets out of the cab and gets
13   him, pulls him out of the cab, gets him on the ground
14   and -- well, I forgot; he kicked him and punched him
15   while he was in the cab.  Then, he got him out of the
16   cab.  And Mr. Natter, stunned apparently to inaction,
17   watches all this without interference.

18   And after Mr. Rose and Mr. O'Dea are out of
19   the cab and Mr. O'Dea is being -- Mr. O'Dea,
20   Mr. O'Diare -- Mr. Diare; I'm sorry, Mr. O'Dea.

21   Mr. Diare is striking Mr. Rose outside the
22   cab.  Mr. Natter pulls the keys from the car, throws
23   them back in the car, thereby distracting, presumably,
24   Mr. Diare from his attack; and they both scamper up
25   the hill.

1          Well, there's one little confusing part
2     about the argument of counsel because he talked a lot
3     about those keys as if it wasn't true that the keys
4     where taken.
5          Well, of course they were taken.  Mr. Natter
6     said so.  Took them out of the ignition and threw them
7     in the car.  Of course, they were taken.
8          So I don't know how, all of a sudden, it's
9     wholly incredible that he was left to use his second
10    set of keys, when he admits that keys he did use.  And
11    if he had the keys, what in the world was he making an
12    issue about, about theft of the keys.  He has got
13    almost aggravated assault going for him.  He certainly
14    doesn't need theft of the car keys.
15         But in any case, whatever.  I never did
16    understand that argument because it is admitted by
17    Mr. Natter that he took the keys out of the ignition
18    and threw them in the car.
19         Now, the part that's a little bit confusing
20    is that Mr. Diare has assaulted Mr. Rose, has beaten
21    Mr. Rose tremendously.  He has done so unfettered by
22    Mr. Natter.  And except for being distracted by the
23    keys, there is no impediment to him grabbing Mr. Rose,
24    who cannot run, and continuing his assault.
25         And clearly, the assault is described as not

1    one which we have any reason to believe dissipated.

2    It was unprovoked.  It was vicious.  It was extensive.

3    But then, it stopped.

4            Now, Mr. Diare, on the other hand, makes a

5    phone call.  Not a phone call; a radio call.  And the

6    radio call alleges that he's being beaten.

7            Now I'm not sure how that fits into the

8    assault because as I understood the testimony, that

9    actually occurred before he struck Mr. Rose.  But

10   let's assume that if it happened before he struck

11   Mr. Rose, then I don't know what it's for at all.

12   There is nothing going on, except a complaint about

13   where you're going.  So I don't know why that would

14   happen.

15           But it makes more sense, I guess, if he

16   attacks Mr. Rose without provocation, that he cover

17   the act of attacking Mr. Rose without provocation by

18   making the call.  But, of course, if he is attacking

19   Mr. Rose without provocation while he's making a call,

20   one would tend to suspect that there would be an equal

21   amount of chatter on the radio with respect to the

22   fact that he's being -- someone else in the vehicle,

23   Mr. Rose or somebody else, is being attacked.

24           But there is an explanation to be gleaned

25   from the fact that Mr. Rose may be pulled over the

77

1    seat with his face down in the seat at the time the

2    call is made, which would explain why he would not be

3    heard on the radio and Mr. Diare would.  And because

4    Mr. Natter is busy getting out of the car, that would

5    explain why he wouldn't be on the radio either.

6            See, my problem is this is why you have

7    trials because the evidence is such that it is

8    amenable to a resolution one way or the other, and

9    that it would not be, in my view, subject to a motion

10   for judgment of acquittal.

11           Now, I confess on this, folks.  It's not

12   clear to me whether or not it's intended for me to try

13   the case with a lower burden of proof in which, if the

14   lower burden of proof is reached, you don't get

15   acquitted; you get expunged.  Or, whether you try the

16   case to determine whether or not there was, in fact, a

17   legally cognizable case to be tried.

18           Am I making myself clear about the

19   distinction I'm trying to draw?

20           MR. MOHANTY:  I think so, Your Honor.

21           THE COURT:  I'm a little confused about the

22   rule and the cases in that regard because I'm not sure

23   how you do the former.  I don't know how you do a

24   trial for assault, for example, that is resolved on

25   the basis of clear and convincing.  I don't know how

1    you do that.

2          I do know how you do clear and convincing as

3    to whether or not as a matter of law one could charge

4    a crime.  I know that because I have to do that from

5    time to time.

6          But I'm not, I'm not personally clear about

7    what the law is with respect to that.  What I think it

8    is, is how I'm going to rule.  And I say that because

9    I really do invite your scrutiny of my approach and

10   scrutiny of my conclusion.

11         MR. O'DEA:  Might I present, advise the

12   Court of one thing?

13         THE COURT:  Sure.

14         MR. O'DEA:  From the transcript.

15         THE COURT:  Sure.

16         MR. O'DEA:  Mr. Rose alleged that "this is

17   bullshit, and I'm going to call the company; you're

18   not fit to be a driver," before any of this allegedly

19   occurred.

20         The Court seemed to be unclear.  I thought

21   we'd presented that.  I'll present the transcript, if

22   the Court wishes.

23         THE COURT:  Oh, I'm sorry.  I took that as

24   the actual words used for him to express the extent of

25   his unacceptance of what was going on.

ATTACHMENT "B"

[Judge Dorsey's November 22, 2002 oral ruling at conclusion of hearings on Rose's December 18, 2001 Motion For Reconsideration in F-431-99 (D.C. Superior Court) (pages 1-2, 69-92 of November 22, 2002 Transcript)]

Judge Roberts
07-CV-0926

2003R02025

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

```
_____
                               )
UNITED STATES OF AMERICA       )
                               )  Criminal Action No.:
            vs.                )         F-431-99
                               )
PETER ROSE,                    )
                 Defendant     )
_____)
```

Washington, D. C.

Friday, November 22, 2002

The above-entitled action came on for a motion
hearing before the Honorable FREDERICK DORSEY,
Associate Judge, in Courtroom Number 210,
commencing at 2:38 p.m.


            THIS TRANSCRIPT REPRESENTS THE PRODUCT
            OF AN OFFICIAL REPORTER, ENGAGED BY THE
            COURT, WHO HAS PERSONALLY CERTIFIED
            THAT IT REPRESENTS THE TESTIMONY AND
            PROCEEDINGS OF THE CASE AS RECORDED.

            APPEARANCES:

            On Behalf of the Government:

            NADIR MOHANTY, Esquire
            Assistant United States Attorney


            On Behalf of the Defendant:

            JAMES O'DEA, III, Esquire
            1111 Fourteenth Street, N.W.
            Suite 1000
            Washington, DC  20005

KATHY E. JACKSON
Official Court Reporter                    (202)879-1064

1

TABLE OF CONTENTS

2

INDEX OF EXAMINATION

3

WITNESSES

4

On behalf of the Defendant:

| | Direct | Cross | Re Direct | Re Cross |
|---|---|---|---|---|
| WILLIAM HENRY NATTER | | | | |
| By Mr. O'Dea | 4 | | | |
| By Mr. Mohanty | | 17 | | |
| By Mr. O'Dea | | | 21 | |
| | | | | |
| PETER JEROME ROSE | | | | |
| By Mr. O'Dea | 23 | | | |

5

6

7

8

9

10

INDEX OF EXHIBITS

11

Received

12

On behalf of the Defendant:
| | Received |
|---|---|
| Number 10A (photograph) | 29 |
| Number 10B (photograph) | 29 |
| Number 10C (photograph) | 29 |
| Number 10D (photograph) | 29 |

13

14

15

16

INDEX OF MISCELLANY

17

Page

18

Argument on behalf of the Defendant................ 29

Argument on behalf of the Government.............. 50

Rebuttal Argument on behalf of the Defendant....... 65

Court's Ruling.................................... 70

Certificate of Court Reporter..................... 93

19

20

21

22

23

24

25

2

1   convincing, objective evidence in this case is that
2   Mr. Rose was assaulted.
3             There is no evidence of Mr. Diare being
4   assaulted.  There is evidence of Mr. Diare acting in
5   an excited manner.  There is past history in this
6   area.  Could deem to be a little out of date.
7             MR. MOHANTY:  Objection:
8             THE COURT:  Sustained.  Let's move on,
9   Mr. O'Dea.
10            MR. O'DEA:  And I submit to the Court that
11  the evidence is clear that Mr. Rose committed neither
12  assault, nor taking property without right, nor
13  robbery with force and violence.  None of those crimes
14  occurred vis-a-vis Mr. Rose.
15            It is clear that Mr. Rose was assaulted.  It
16  is clear that Mr Rose was injured.  There is no
17  evidence, except Mr. Diare's statement, that Mr. Rose
18  struck him.
19            There is no objective evidence.  There is no
20  medical evidence.  There is no markings or tearings in
21  the car.  There is no evidence of anybody damaging the
22  vehicle, damaging Mr. Diare's clothing, doing anything
23  that would indicate objectively that he had, in fact,
24  been assaulted.
25            There is evidence objectively that Mr. Rose

1   had been assaulted.  There is no evidence that

2   Mr. Rose any time attempted to take any object from

3   Mr. Diare.  That's what he was charged with.

4           All of the crimes in this case, Mr. Rose has

5   presented clear and convincing evidence he didn't

6   commit them, but was the victim of them.

7           THE COURT:  The backdrop of the case.  This

8   is a --

9           This is not a situation, if you will, in

10  which nothing happened; that is to say that either the

11  incident, however it broke down, didn't occur; or, the

12  people identified to having participated in the

13  incident actually weren't involved in the incident.

14  So let's put that out of the way.

15          Mr. Diare, Mr. Natter and Mr. Rose were, in

16  fact, in a cab on that morning, on a highway in the

17  District of Columbia, in the early morning hours of, I

18  believe it's the 19th or the 16th.

19          MR. O'DEA:  16th, Your Honor.

20          THE COURT:  16th of January of '99.  No

21  question as to identity.  No question as to

22  jurisdiction.  Happened in D.C.  No question that

23  something happened.

24          The issue is whether or not based on the

25  information that was then available -- and arguably is

70

1    now available, but I'm not real clear about that one

2    -- whether or not there was evidence to indicate that

3    the defendant committed a crime at that time and in

4    that place.  Or phrased more correctly, as Mr. O'Dea

5    said, that it is clear and convincing that he did not

6    commit that crime at that place.

7         It's interesting because in addition to the

8    fact that he has a burden, he has a burden which is

9    sometimes more difficult because it's a burden to

10   prove the negative as opposed to the positive.

11        There is a -- there is an allegation by both

12   sides that the testimony with respect to the other

13   side is not to be credited.  And both sides seem to

14   feel very strongly about that.  And both sides feel

15   apparently equally strongly that the testimony

16   proffered by their side is totally without doubt,

17   without deficiency, without question.

18        I can tell you that I'm not concerned about

19   this being one of the few cases in which I am

20   convinced that everybody or anybody told exactly what

21   happened exactly the way it happened.  I don't have to

22   worry about that because I don't think that is true.

23        Mr. Diare, as has been shown by the

24   evidence, has made inconsistent statements with

25   respect to lots of things:  Locations, times,

71

1    statements, behaviors, lots of things.

2           Mr. Rose has made lots of statements, none

3    of which, as I recall -- well, let me put it another

4    way; I won't say "none of which" -- are clearly not

5    subject to the level and extent of inconsistency as

6    was demonstrated by Mr. Diare.

7           And clearly, Mr. Natter also did not make

8    inconsistent statements to the extent that we saw in

9    evidence in this case.

10          So if we determine credibility by the

11   consistency of one's testimony, we could probably get

12   to "clear and convincing" without a whole lot of

13   difficulty, except that that's not the only basis upon

14   which credibility must be determined, as the parties

15   know.

16          Mr. O'Dea says that there's no evidence, no

17   physical, objective evidence that Mr. Rose struck

18   Mr. Diare.

19          Well, yes, there is.  Mr. Rose was described

20   as having bruises to his knuckles on the morning

21   following the incident.  The last I heard, whether it

22   is conclusive or not, that certainly is physical

23   evidence that would corroborate an allegation that he

24   had struck somebody.  It's objective; it's physical;

25   and, it's evidence.

1          There is evidence that as a result of the

2     attack by Mr. Diare, Mr. Rose lost a contact lens.  Of

3     course, there's also testimony that at the time he was

4     struck by Mr. Diare, he was wearing glasses.

5          So, no, it's not some simple question about

6     whether or not two respected citizens of our community

7     are to be believed over a recent immigrant with a

8     history of violence; a taxi cab driver, no less, who

9     apparently is prone to driving people several miles

10    out of their way in the course of doing his job.  No,

11    this isn't about all that.

12         This is about whether or not, as you listen

13    to the testimony, as you observe the witnesses, you

14    have a sense of credibility in terms of what makes

15    sense, what people appear to be truthful about or

16    forthright about or not.  That's what this is about.

17         So really, while it's important, I think,

18    for someone to decide whether or not the detective,

19    when questioning a suspect with as little information

20    as he had, would pull a gun while knocking on a door,

21    might be something for his department to look into, it

22    seems to me it has absolutely nothing to do with what

23    happened in that cab.

24         Now here's what we know about what happened

25    in the cab.  We know that Mr. Diare did not take an

1    appropriate route to deposit Mr. Natter and Mr. Rose

2    at their objective location.  We know that.  Why?

3    Because it is uncontroverted.

4          We also know that that started with an issue

5    of concern and escalated to unacceptable behavior as

6    far as the riders were concerned.  That is to say, it

7    was clear that at some point, the riders in the cab

8    concluded that this ride had gone out of the way long

9    enough.  No question about that.  That's

10   uncontroverted.

11         Well, this is where I guess fact finding

12   comes into play.

13         Mr. Rose contends that by virtue of his

14   annoyance with being driven out of the way, even

15   though Mr. Diare concedes that he was wrong,

16   Mr. Diare's response to that was to punch Mr. Rose in

17   the face.  Mr. Rose has done nothing except asked to

18   be taken where he has a right to be taken in the most

19   direct route; that's all he's done.

20         He hasn't been hostile.  He hasn't been

21   negative.  As a matter of fact, he's virtually ignored

22   him.  He's busy talking to Mr. Natter in the back seat

23   catching up on old times.

24         But the mere confrontation as to being taken

25   out of his way, slamming the back of the seat causes

74

1    Mr. Diare to, while driving, turn and punch Mr. Rose
2    in the face with his left hand.

3            But that's not enough because Mr. Rose has
4    not done anything even now.  Mr. Diare pulls Mr. Rose
5    from the back seat into the front seat and begins to
6    pummel him.

7            According to Mr. Natter, at no point is
8    Mr. Rose striking Mr. Diare.

9            Now based solely on the confrontation, that
10   is to say, I'm out of the cab right now, he not only
11   strikes him in the face; he not only pulls him across
12   the seat.  But he also gets out of the cab and gets
13   him, pulls him out of the cab, gets him on the ground
14   and -- well, I forgot; he kicked him and punched him
15   while he was in the cab.  Then, he got him out of the
16   cab.  And Mr. Natter, stunned apparently to inaction,
17   watches all this without interference.

18           And after Mr. Rose and Mr. O'Dea are out of
19   the cab and Mr. O'Dea is being -- Mr. O'Dea,
20   Mr. O'Diare -- Mr. Diare; I'm sorry, Mr. O'Dea.

21           Mr. Diare is striking Mr. Rose outside the
22   cab.  Mr. Natter pulls the keys from the car, throws
23   them back in the car, thereby distracting, presumably,
24   Mr. Diare from his attack; and they both scamper up
25   the hill.

1  　　　　　Well, there's one little confusing part
2  about the argument of counsel because he talked a lot
3  about those keys as if it wasn't true that the keys
4  where taken.

5  　　　　　Well, of course they were taken.  Mr. Natter
6  said so.  Took them out of the ignition and threw them
7  in the car.  Of course, they were taken.

8  　　　　　So I don't know how, all of a sudden, it's
9  wholly incredible that he was left to use his second
10 set of keys, when he admits that keys he did use.  And
11 if he had the keys, what in the world was he making an
12 issue about, about theft of the keys.  He has got
13 almost aggravated assault going for him.  He certainly
14 doesn't need theft of the car keys.

15 　　　　　But in any case, whatever.  I never did
16 understand that argument because it is admitted by
17 Mr. Natter that he took the keys out of the ignition
18 and threw them in the car.

19 　　　　　Now, the part that's a little bit confusing
20 is that Mr. Diare has assaulted Mr. Rose, has beaten
21 Mr. Rose tremendously.  He has done so unfettered by
22 Mr. Natter.  And except for being distracted by the
23 keys, there is no impediment to him grabbing Mr. Rose,
24 who cannot run, and continuing his assault.

25 　　　　　And clearly, the assault is described as not

76

1   one which we have any reason to believe dissipated.

2   It was unprovoked.  It was vicious.  It was extensive.

3   But then, it stopped.

4        Now, Mr. Diare, on the other hand, makes a

5   phone call.  Not a phone call; a radio call.  And the

6   radio call alleges that he's being beaten.

7        Now I'm not sure how that fits into the

8   assault because as I understood the testimony, that

9   actually occurred before he struck Mr. Rose.  But

10  let's assume that if it happened before he struck

11  Mr. Rose, then I don't know what it's for at all.

12  There is nothing going on, except a complaint about

13  where you're going.  So I don't know why that would

14  happen.

15       But it makes more sense, I guess, if he

16  attacks Mr. Rose without provocation, that he cover

17  the act of attacking Mr. Rose without provocation by

18  making the call.  But, of course, if he is attacking

19  Mr. Rose without provocation while he's making a call,

20  one would tend to suspect that there would be an equal

21  amount of chatter on the radio with respect to the

22  fact that he's being -- someone else in the vehicle,

23  Mr. Rose or somebody else, is being attacked.

24       But there is an explanation to be gleaned

25  from the fact that Mr. Rose may be pulled over the

1    seat with his face down in the seat at the time the

2    call is made, which would explain why he would not be

3    heard on the radio and Mr. Diare would.  And because

4    Mr. Natter is busy getting out of the car, that would

5    explain why he wouldn't be on the radio either.

6         See, my problem is this is why you have

7    trials because the evidence is such that it is

8    amenable to a resolution one way or the other, and

9    that it would not be, in my view, subject to a motion

10   for judgment of acquittal.

11        Now, I confess on this, folks.  It's not

12   clear to me whether or not it's intended for me to try

13   the case with a lower burden of proof in which, if the

14   lower burden of proof is reached, you don't get

15   acquitted; you get expunged.  Or, whether you try the

16   case to determine whether or not there was, in fact, a

17   legally cognizable case to be tried.

18        Am I making myself clear about the

19   distinction I'm trying to draw?

20        MR. MOHANTY:  I think so, Your Honor.

21        THE COURT:  I'm a little confused about the

22   rule and the cases in that regard because I'm not sure

23   how you do the former.  I don't know how you do a

24   trial for assault, for example, that is resolved on

25   the basis of clear and convincing.  I don't know how

1    you do that.

2         I do know how you do clear and convincing as

3    to whether or not as a matter of law one could charge

4    a crime. I know that because I have to do that from

5    time to time.

6         But I'm not, I'm not personally clear about

7    what the law is with respect to that. What I think it

8    is, is how I'm going to rule. And I say that because

9    I really do invite your scrutiny of my approach and

10   scrutiny of my conclusion.

11        MR. O'DEA: Might I present, advise the

12   Court of one thing?

13        THE COURT: Sure.

14        MR. O'DEA: From the transcript.

15        THE COURT: Sure.

16        MR. O'DEA: Mr. Rose alleged that "this is

17   bullshit, and I'm going to call the company; you're

18   not fit to be a driver," before any of this allegedly

19   occurred.

20        The Court seemed to be unclear. I thought

21   we'd presented that. I'll present the transcript, if

22   the Court wishes.

23        THE COURT: Oh, I'm sorry. I took that as

24   the actual words used for him to express the extent of

25   his unacceptance of what was going on.

79

1        MR. O'DEA:  After the car had stopped, yes.

2        THE COURT:  Well, that's a little

3   problematic.  And the reason that it's problematic,

4   counsel, is --

5        I'm not arguing about whether or not it's

6   problematic that he said it.  It's problematic because

7   it's in the context of it being alleged that while the

8   car was moving, the first blow occurred.  And --

9        MR. O'DEA:  Not from our testimony.  That

10  was Mr. Diare's testimony.

11       THE COURT:  No, no, no, no, no.  I'm talking

12  about the blow to the eye.

13       MR. O'DEA:  No, Your Honor.  That was after

14  the --

15       The testimony was:  Slam the car seat; pull

16  this damn car over; car pulls over; turns around; I'm

17  going to report you to a Goddam driver (sic); and

18  then, the blow to the eye.  That was the testimony of

19  Mr. Rose's.

20       THE COURT:  Would you let me see that?

21       MR. O'DEA:  Yes.  Page 40, from about line

22  -- I'm sorry -- ten through 41, line, I think, 20.

23       (Thereupon, the Court examined the

24       transcript.)

25       THE COURT:  I know that's the testimony of

1    Mr. Natter.  I did not --
2            (The court continues to examine the
3        transcript.)
4            MR. O'DEA:  I believe you still have
5    Mr. Natter's testimony, Your Honor.
6            (The Court continues to examine the
7        transcript.)
8            THE COURT:  I stand corrected.  I stand
9    corrected.  Yes; ah, yes.  I stand corrected.  You're
10   absolutely correct.
11           I don't need this.  I have that.
12           (Thereupon, the Court returns the transcript
13       to Mr. O'Dea.)
14           THE COURT:  Yes, I'm sorry.  While -- let me
15   back up.  While -- Ah, yes, I'm sorry.  Let me back
16   up.
17           (Pause.  The Court examined document.)
18           THE COURT:  Yes.  Correct.  When Mr. Diare
19   made the call, according to the testimony of the two
20   passengers, the car was stopped; he made the call.
21   Well, let me back up.
22           They demanded that he stop the car.  He did,
23   in fact, stop the car.  They indicated that they were
24   getting out.  He made the call, after he'd stopped the
25   car.  And then, he turned to strike Mr. Rose.  Right.

1    MR. O'DEA:  And Mr. Rose had threatened to

2    report him as a bad driver to the company.

3    THE COURT:  Well, yes.  Well, let me back up

4    for a second.  Mr. Rose indicated that he wanted him

5    to stop the car.  He stopped the car.  Correct?  You

6    do recall it?

7    MR. O'DEA:  Absolutely, Your Honor.  Yes.

8    THE COURT:  Both witnesses say that.

9    MR. O'DEA:  Yes.

10   THE COURT:  Okay.  So he has the car

11   stopped.  Then, he goes on the phone, to the radio,

12   according to their testimony.

13   MR. O'DEA:  No.  He stops the car; there's a

14   verbal exchange.  And that's when Mr. Rose tells him

15   that --

16   THE COURT:  No.  Mr. Natter:  The car

17   stopped; he grabbed the radio; they're beating me,

18   they're robbing me; dropped the microphone and struck

19   him in the face.

20   MR. O'DEA:  Right, Mr. Rose's testimony.

21   THE COURT:  Same thing:  grabbed the radio;

22   yelled; call the police; they're beating me, they're

23   robbing me; driver then punched him in the eye.

24   MR. O'DEA:  He said, he said:  Fuck you, I

25   take you where I take you.

1          THE COURT:  Let's remember where I'm at.

2    I'm talking --

3          MR. O'DEA:  I'm talking about just --

4          THE COURT:  Go ahead.

5          MR. O'DEA:  The car stops; there's a verbal

6    altercation.  Mr. Rose threatens, tells him he's going

7    to get out, he's going to report him to the company,

8    he's a lousy driver.  Then the radio comes on.

9          THE COURT:  Okay.  He's still in the car,

10   though.

11         MR. O'DEA:  Oh, absolutely, hasn't gotten

12   out of the car.  The radio suddenly comes on.

13         THE COURT:  Hasn't gotten out of the car

14   yet.  Fine.

15         I'm getting out.  He stops the car.  He

16   grabs the radio.  The car is stopped; he's on the

17   radio.

18         MR. O'DEA:  Right, Your Honor.  But the

19   verbal altercation occurs --

20         THE COURT:  You want to talk about the

21   verbal altercation.  I want to talk about the fact

22   that while he's on the radio, he stays in the car.

23         MR. O'DEA:  Yes.

24         THE COURT:  There is a conversation on the

25   radio.

1      MR. O'DEA:  Yes.

2      THE COURT:  That we heard.

3      MR. O'DEA:  Yes.

4      THE COURT:  The microphone is put down.

5      MR. O'DEA:  Yes.

6      THE COURT:  He's still in the car.

7      MR. O'DEA:  Yes.

8      THE COURT:  Then, he gets punched.

9      MR. O'DEA:  Yes.

10     THE COURT:  Now at the precise time that he

11  gets punched, there is no altercation.  There is no

12  conversation.  The only conversation was between

13  Mr. Diare and the dispatcher.

14     MR. O'DEA:  No.  Before Mr. Diare picked up

15  the radio --

16     THE COURT:  Sir, you keep wanting me to go

17  before that radio, and I'm talking about after the

18  radio.  And it's in that transcript.

19     MR. O'DEA:  I know that, Your Honor.

20     Car stops.  Mr. Rose threatens to call his

21  company.  He picks up the radio.  He makes the

22  statements.  Mr. Rose dumbstruck.  Mr. Diare --

23     THE COURT:  Oh, no, no, no no.  Don't give

24  me editorial now.

25     MR. O'DEA:  All right.  Fine.

84

1          THE COURT:  All I wanted to do --

2          MR. O'DEA:  Car stops.

3          THE COURT:  -- was say what this testimony

4     says.

5          MR. O'DEA:  That's right.

6          THE COURT:  Fine.

7          MR. O'DEA:  The car stops.  Mr. Rose

8     threatens him.  He picks up the radio.  He turns --

9     Mr. Rose doesn't leave the car.  Mr. Diare turns and

10    punches him.

11         THE COURT:  Thank you.

12         MR. O'DEA:  Thank you.

13         THE COURT:  At the time that Mr. Diare is on

14    the radio, there's no verbal altercation, according to

15    the testimony.  It preceded the radio, as you have

16    told me now at least four times.  Okay.

17         He has made the call.  He has said he's

18    being robbed, et cetera.  He's dropped the microphone.

19    They are still in the car.  There is no assertion of

20    any further discussion.  He simply puts the microphone

21    down and punches Mr. Rose.

22         That's all I have in the testimony.  If

23    there's something else in the testimony, then you need

24    to tell me.  But please don't tell me what happened

25    before the microphone.

1        MR. O'DEA:  Not at all, Your Honor.

2        THE COURT:  Thank you.

3        Okay.  Now at this point, having just

4   accused them of robbing him and beating him, he

5   punches them -- he punches him in the eye.  Not them,

6   him in the eye.  And pulls him over the seat, pummels

7   him on the seat, kicked him and manages to get outside

8   the car, and still is attacked by Mr. Diare.

9        I'm sorry.  I was wrong with the sequence

10  with respect to the car still being in operation,

11  although I don't know why I had that recollection.

12       Yes.  So with respect to what you said about

13  before the microphone, when he is threatened with

14  losing his job and losing his livelihood and losing

15  everything that he works for as an immigrant in the

16  country, his response is not to beat up Mr. Rose at

17  that time.

18       His response at that time is to plan his

19  resolution by setting up, calling in to the dispatcher

20  and establishing an alibi and then, proceeding to

21  attempt to beat up on Mr. Rose.

22       Mr. Diare, on the other hand, says that

23  there were some complaints about the direction in

24  which he's going.  He throws in a little, few racial

25  slurs just to make sure he has my attention.

86

1          And then, he says that when he attempts to

2     make it right, that is to say he says he's going to

3     turn off the meter and get them eventually to where

4     they're going, they reach over the seat, grab him,

5     beat him, and otherwise attack him; that at some point

6     they simply stop their attack and flee the scene.

7          Government argues that that behavior is

8     corroborated by the fact that when they left the

9     scene, they took no action with respect to the event;

10    that they got a taxi cab to take them home.  And

11    rather than call the police, they called a bartender,

12    the explanation for which is they're very tired and

13    they need to get some sleep.

14          I would imagine, however, having just been

15    beaten and attacked in the manner in which they

16    described, that it really does make sense for their

17    first phone call to be to the police.  It really does.

18    As a matter of common sense, a person would assume

19    that they would be hot-to-trot to get a police

20    officer.

21          I mean, people react to crisis in different

22    ways.  But to choose to call a bartender about who to

23    call in a cab as opposed to tell a police officer

24    you've just been beaten and attacked without

25    provocation, a person could reasonably believe that

1    that's inconsistent.  And that's the argument.

2         Now, Mr. Natter says he took the keys and

3    threw them in the car.  It would appear, however, that

4    they had no conversation about what had happened

5    because by a few hours later, apparently, Mr. Rose is

6    unaware that he took the keys and threw them in the

7    car.  Or maybe not unaware because at least the

8    not-to-be-believed detective says that Mr. Rose said

9    that he didn't know anything about his keys, but maybe

10   his associate did.

11        There is much to be believed and disbelieved

12   on both sides.  There really are.  But one thing that

13   I'm unable to believe based on listening to the

14   witnesses, and that is I'm unable to accept the notion

15   that there was no physical action taken by Mr. Rose

16   with respect to this incident.

17        I come to that conclusion because, first of

18   all, it's sort of not common sense; but secondly,

19   there's the information that his knuckles were

20   bruised.

21        And finally, I guess just as a matter of

22   credibility, the manner in which it is alleged that

23   Mr. Diare, quote, "set this up" is not believable to

24   me.

25        Were I to be ruling on this case as a

1    regular criminal case, I don't have any reason to say

2    anything other than that I would say that there is not

3    proof beyond a reasonable doubt.  There's no question

4    that I would say that.  No question that I would say

5    that.  But that's not what I'm asked to rule on.

6           And do I believe that there was no offense

7    committed by Mr. Rose beyond a reasonable doubt -- not

8    beyond a reasonable doubt -- by a preponderance of the

9    evidence?

10          I mean, I can't say that.  I can't say that

11   because I'm not, I am not convinced of his candor and

12   accuracy or his perception, for that matter, with

13   respect to these events.  I do not believe that this

14   record supports a clear and convincing conclusion that

15   he was, without provocation, physically attacked and

16   that that's what happened.  I can't conclude that.  So

17   I don't.  I don't know what happened that night.  But

18   I know I cannot reach a conclusion by clear and

19   convincing evidence.

20          I'm sorry; I keep doing that.  I really

21   apologize.  I have said out of my mouth all three

22   standards with respect to my decision.  I have said

23   the words "beyond a reasonable doubt."  I have said

24   "preponderance of the evidence."  I have said "clear

25   and convincing."  I apologize.

1    The problem is that what I'm doing here is
2    so unnatural to me, and I apologize for that, that I
3    start using terms that I am used to referring to.
4    No, this does not involve beyond a
5    reasonable doubt; and I'm not finding that, except to
6    say that I know that you could not prove this case
7    based on this evidence beyond a reasonable doubt.
8    That's my correct use of "beyond a reasonable doubt."
9    But with respect to "clear and convincing"
10    and "preponderance of the evidence," it really doesn't
11    matter which I use, even though the correct standard
12    is clear and convincing, because I would not come to
13    this conclusion by a preponderance of the evidence
14    either.  Why?  Because I cannot reach the 51 percent.
15    I cannot reach the 51 percent.
16    Now I have to add one other thing because I
17    am not unaware of the significance of my decision in
18    this case.  It has been brought to my attention, and I
19    have not lost sight of it.  I am told, it has been
20    proffered to me by Mr. O'Dea that this has a
21    significant impact with respect to the White House.
22    It also has a significant impact with respect to
23    Mr. Rose's ability to do what he does for a living.
24    I regret that.  I regret that for lots of
25    reasons, not the least of which I don't want to

1    interfere with his livelihood.  But more importantly,

2    I regret it because this system does not, in my view,

3    permit a conclusion based on the consequence to

4    people's lives of rules of law.

5         While I do take into consideration

6    manifesting justice, it has to still be based upon

7    premise and what the facts show.  And I only commend

8    Mr. Rose, for whatever value it may have to him, to

9    recourse to this transcript, which clearly indicates

10   that it is at least this fact-finder's view that he

11   could not be convicted of this offense.

12        But you see, the problem is it's only this

13   fact-finder.  And the one that actually tried this

14   case could have a different conclusion entirely.

15        The Motion for Reconsideration is denied.

16        MR. MOHANTY:  Thank you, Your Honor.

17        MR. O'DEA:  Thank you, Your Honor.  May I be

18   excused?

19        THE DEFENDANT:  Thank you, Your Honor.

20        THE COURT:  Yes.

21        MR. O'DEA:  Your Honor, I believe you have

22   one of my transcripts.

23        THE COURT:  I do, and I'm about to put it

24   back.  I don't think it was taken apart.

25        MR. O'DEA:  I took it apart.

1          THE COURT:   Thank you.

2              (Thereupon, the Court returned the

3      transcript to Mr. O'Dea.)

4          MR. O'DEA:   Thank you.

5          THE DEFENDANT:   Thank you.   Have a good

6  holiday.

7          THE COURT:   You have a good holiday, and

8  good luck to you, Mr. Rose.

9          THE DEFENDANT:   Thank you, sir.

10             (Thereupon, the proceedings in the

11      above-entitled action were concluded 4:55 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

92

1

2

3

4                    <u>CERTIFICATE</u> <u>OF</u> <u>REPORTER</u>

5            I, Kathy E. Jackson, an Official Court

6    Reporter for the Superior Court of the District of

7    Columbia, do hereby certify that I reported, by

8    computerized machine shorthand, the proceedings held

9    and testimony adduced, upon the motion hearing in the

10   case of UNITED STATES OF AMERICA versus PETER ROSE,

11   Criminal Action Number F-431-99 in the said Court, on

12   the 22nd day of November 2002.

13           I further certify that the foregoing 92

14   pages constitute the official transcript of said

15   proceedings, as taken from my computerized machine

16   shorthand notes, together with the back up tape of

17   said proceedings.

18           In witness whereof, I have hereunto

19   subscribed my name, this the 10th day of December

20   2002.

21

22

23

24                    OFFICIAL COURT REPORTER

25

93

ATTACHMENT "C"


[Judge Dorsey's January 9, 2003 Order denying Rose's December 3, 2002
Motion for the Court to Reconsider its Decision of November 22, 2002, in No. F-
431-99 (D.C. Superior Court)]

Judge Roberts
07-CV-0926

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CRIMINAL DIVISION – FELONY BRANCH

UNITED STATES          :

      V.                :     Criminal No. F-431-99

PETER ROSE           :

         Defendant.       :

## O R D E R

This matter comes before the Court for consideration of the Defendant's Motion for

the Court to Reconsider its Decision of November 22, 2002 Denying Defendant's Motion to

Seal Arrest Record filed on December 3, 2002 and the Government's Opposition thereto

filed on January 6, 2002.

The following facts and procedural history are before the Court. On or about

January 19, 1999, the Defendant, Mr. Peter Rose, was arrested and charged with one count

of robbery in violation of D.C. Code § 22-2801 (West 2001) (Count A). The charge was

later reduced to one count of assault in violation of D.C. Code § 22-404 (2001) (Count B)

and one count of taking property without right in violation of D.C. Code § 22-3216 (2001)

(Count C). Counts B and C were nollied by the Government on March 9, 2001.

On July 11, 2001, the Defendant filed a Motion to Seal Record. On November 26,

2001, the Government filed an Opposition in response to the Defendant's Motion. In an

Order dated December 5, 2001, the Court denied the Defendant's Motion to Seal. On

December 18, 2001, the Defendant filed a Motion for Reconsideration along with attached

affidavits. In the Government's Opposition to Defendant's Motion for Reconsideration

filed on February 4, 2002, the Government suggested that the Court convene a hearing on

A TRUE COPY
TEST: 5/7/03
Clerk, Superior Court of the
District of Columbia
By: _____
Deputy Clerk

the Defendant's Motion. On February 12, 2002, the Court set the above-captioned matter

for a hearing. The Defendant's Motion for Reconsideration was subsequently denied by the

Court on November 22, 2002 following a series of hearings spanning eight days during

which nine witnesses testified.[1] The Defendant is now requesting that the Court once again

reconsider its decision.

As grounds for his Motion, the Defendant states that he has presented clear and

convincing evidence that he did not commit the crimes with which he is charged. The

Defendant also claims that before the Court's decision denying his Motion to Seal can

stand, he should be allowed an opportunity to explain why he did not respond physically

when allegedly attacked by the complainant and why he never called the police following

the alleged altercation. Finally, the Defendant notes that both the complainant and the U.S.

Park Police detective who prepared the affidavit of probable cause both committed perjury

during the course of the hearing held regarding the Defendant's first Motion to Reconsider.[2]

In its Opposition, the Government contends that in his latest Motion to Reconsider,

the Defendant presents no newly discovered evidence and alleges no errors of law made by

the Court during the hearing on the Defendant's previous motion. Rather, the Defendant

---

[1]    The Court's ruling was swayed in part by two findings. First, the Court
concluded that common sense dictated that the Defendant would call the police, not a
bartender at the bar where he had been at the previous evening, after he was allegedly
attacked by the complainant. Second, the Court did not accept the Defendant's
testimony that he never struck the complainant or that the complainant faked his call to
the police for help.

[2]    The Court notes that any inconsistencies in the testimony given by the
Government's witnesses were previously considered by the Court and do not compel the
conclusion that the Defendant is entitled to have his arrest record sealed.

2

A TRUE COPY
5/7/03
Clerk, Superior Court of the
District of Columbia

By _____
Deputy Clerk

merely restates arguments previously made and rejected by the Court. The Court finds itself in agreement with the Government.

As the conclusion of the hearings held in this matter, this Court found that the Defendant was unable to show by clear and convincing evidence that the offense of assault with which he was charged did not occur. There is nothing in the Defendant's latest pleading to alter this conclusion. The Defendant's desire for an additional hearing to address what the Court found to be weaknesses in his argument at the first hearing is an insufficient basis to request a new hearing. As the Government notes in its Opposition, while the Defendant may continue to disagree with the Court's evaluation of the evidence, that is hardly reason for the Court to grant a motion for reconsideration.

Accordingly, it is this 9th day of January 2003, hereby:

**ORDERED** that the Defendant's Motion for the Court to Reconsider its Decision of November 22, 2002 Denying Defendant's Motion to Seal Arrest Record be, and hereby is, **DENIED**.

**Frederick D. Dorsey**
**Associate Judge**

Copies to:

James O'Dea, III, Esq.
Counsel for the Defendant
1111 14th Street, N.W.
Suite 1000
Washington, D.C. 20005

Nihar Mohanty, Esq.
Assistant United States Attorney
555 4th Street, N.W.
Misdemeanor Branch
Washington, D.C. 20001

3

A TRUE COPY
TEST: 5/7/03
Clerk, Superior Court of the
District of Columbia
By
Deputy Clerk

ATTACHMENT "D"

[Rose's Petition For Rehearing By The Division Or For Rehearing En Banc, filed August 19, 2005 in No. 04-CO-434 (District of Columbia Court of Appeals)]

Judge Roberts
07-CV-0926

**ORIGINAL**

DISTRICT OF COLUMBIA COURT OF APPEALS

RECEIVED

| | | |
|---|---|---|
| PETER ROSE, | ) | App. No. 04-CO-834 |
| Appellant | ) | |
| | ) | DISTRICT OF COLUMBIA COURTS |
| vs. | ) | |
| UNITED STATES, | ) | |
| Appellee | ) | AUG 1 9 2005 |

AUG 1 9 2005
DISTRICT OF COLUMBIA COURT OF APPEALS

**APPELLANT'S PETITION FOR REHEARING BY THE DIVISION OR FOR REHEARING EN BANC**

COMES NOW the Appellant, Peter Rose, by and through the undersigned Counsel, and in accordance with DC-App. Rules 35 and 40, hereby Petitions this Honorable Court for Rehearing or for Rehearing en Banc in the above matter, and in support hereof states as follows:

1. That this proceeding involves a question of exceptional importance concerning the appropriateness and/or Constitutionality of the standard for sealing arrest records set forth in SCR-Crim. Rule 118 (hereinafter referred to as the "Rule 118 Standard.")

2. That the subject arrest occurred in January 1999 and Appellant was charged with felony robbery by force and violence. That after a preliminary hearing, the Court found no probable cause for the arrest and dismissed the charge.

3. That approximately a year later, the government, based on the same set of facts, charged Appellant with the misdemeanors of simple assault and taking property without right.

4. That in March 2001, the government *nolle prossed* these two charges.

5. That Appellant filed a motion to seal with respect to both the felony robbery charge and the two misdemeanor charges.

6. That Appellant's Motion was denied by the Superior Court and Appellant appealed the denial.

7. That oral argument on the appeal occurred on February 2, 2005.

8. That a written opinion of this Appellate Court, dated August 4, 2005, affirmed the Superior Court's denial of Appellant's motion to seal his arrest record.

9. That in its August 4, 2005 opinion this Court acknowledged that the trial Judge stated unequivocally that there "is no question...[that] there is not proof beyond a reasonable doubt [to support a conviction of the Appellant]." *See* August 4, 2005 Opinion at p. 3.

10. That the Appellant is a former Congressional staffer who holds top secret clearance from the Department of Defense. That he is a consultant in the private sector with respect to major weapons systems, and his clients include, among others, Lockheed Martin and other major defense industry businesses.

11. That Appellant's position involves access to the Oval Office of the White House; access to other secure areas; and frequent travel throughout the United States and the world.

12. That in rendering its decision, this Honorable Court overlooked and/or misapprehended the severe adverse consequences Appellant has and continues to suffer to this day solely as a result of the record of the arrest over six years ago, including the following:

    a. Appellant being denied access to the White House even though he was an invited guest of then President Clinton, who was to meet with Appellant and Appellant's clients in the Oval Office of the White House (said denial of access occurring right in front of Appellant's clients, at the entrance to the White House grounds);

    b. Appellant being delayed and detained by uniformed Secret Service agents, right in front of Appellant's client, at the entrance to a meeting at the Office of Management & Budget, which detention resulted in Appellant missing the meeting;

    c. Appellant being delayed and detained by uniformed Secret Service agents, right in front of a client, at the entrance to the Old Executive Office Building, where Appellant was to meet with high level White House staff concerning homeland security;

d.  Appellant having to decline invitations to meet with President Bush and to attend other meetings with important officials or in secure locations for fear of, yet again, being detained and publicly and professionally embarrassed;

e.  Appellant being disqualified from the Transportation Security Administration Registered Traveler Pilot Program, which program is designed to expedite the airport screening process for frequent travelers; and

f.  Appellant having heightened fear and apprehension whenever in contact with law enforcement (e.g., when Appellant was stopped by a police officer for a routine traffic violation, the officer, upon learning of Appellant's arrest for felony robbery, immediately changed his attitude from friendly to defensive, on edge, suspicious and threatening, and said officer even went so far as to ask to search Appellant's vehicle even though the officer had no probable cause or reason to suspect anything, other than his knowledge of Appellant's felony arrest).

13. That as a result, Appellant's ability to perform his job, earn income, advance in his career, and travel freely and without undue fear have been severely and adversely impacted by the arrest record.

14. That the arrest record therefore is impeding Appellant's Constitutional rights, including, but not limited to, his liberty and property rights. *Cf. Dawkins v. U.S.*, 535 A.2d 1383, 1386 at n. 3 (D.C. 1988) (indicating, in the context of issues relating to the sealing of arrest records, that an individual's Constitutional liberty and property rights are implicated where interests such as employment, are affected.).

15. That Appellant's Constitutional rights outweigh any benefit to society in maintaining a record of his arrest.

16. That the Rule 118 Standard for sealing arrest records, which puts the burden on the arrestee to prove "by clear and convincing evidence that the offense for which he was arrested did not occur or that he did not commit the offense" is therefore unconstitutional as applied to Appellant.

17. That the Rule 118 Standard was developed in 1979 (see *District of Columbia v. Hudson*, D.C.App., 404 A.2d 175 (1979)), at a time when arrest information was not so easily distributed throughout law enforcement and civilian realms and when law

enforcement personnel had far less sophisticated resources and tools to assist them. Indeed, at that time, desktop computers were rare and the Internet was not even in existence.

18. That the primary rationale for the Rule 118 Standard was the usefulness to police in keeping arrest records to help prevent crimes and apprehend criminals. *Id.*

19. That this supposed usefulness of arrest records – particularly with respect to *nolle prossed* charges – has always been specious and controversial.[1]

20. That today, more than twenty years after the Rule 118 Standard was developed, such usefulness with respect to *nolle prossed* charges is considerably diminished, particularly in view of the many new and advanced technologies and methods developed by law enforcement that do not rely on arrest records.

21. That at the same time, the adverse impacts on the arrestee of the continued existence of an arrest record have substantially grown due to the incredible ease in which arrest information is now available. *See, e.g.* http://www.integrascan.com/criminalrecords/ which offers instant criminal record checks to the general public for $12.95 for a statewide check and $18.95 for a national search.

22. That many, if not most, other jurisdictions have a far lower standard for granting expungement or other similar procedure with respect to records of arrests that resulted in *nolle prossed* charges. (*See, e.g.* Maryland, where expungements are routinely granted upon the submission of a Petition for Expungement of Records reciting that the charges were *nolle prossed* and attaching a release wherein the arrestee waives any claims of wrongful conduct by the arresting officer and his agency.)

23. That the unConstitutionality of the Rule 118 Standard is a question of exceptional importance that should be reheard by this Honorable Court either by a standard panel of Judges or *en banc*.

24. That in light of the technological and other advancements over the past twenty years, which has increased the costs to individuals and decreased the benefits to society of the present Rule 118 Standard, the appropriateness of the current Rule 118 Standard,

---

[1] See, e.g., Hudson, 404 A.2d at 178 ("Our reference to the practice of law enforcement officials using arrest records should not be taken as approval of these specific uses, but, absent a direct attack on any particular use to which we have referred, we must assume that arrest records have an appropriate role in law enforcement and proceed in this opinion on that premise.")

even if it were Constitutional, is a question of exceptional importance that should be reheard by this Honorable Court either by a standard panel of Judges or en banc because

Bernard Solnik, Esq.
5101 Wisconsin Ave., NW Suite 302
Washington, DC 20016
Tel. 202-686-3900
Fax: 202-237-0258
Attorney for Appellant

### Certificate of Service

I hereby certify that on this 18th day of August, 2005 I caused to be served a true and correct copy of the foregoing document and any attachments and exhibits thereto by first class U.S. mail, postage prepaid, addressed to John Fisher, Esq., Assistant U.S. Attorney, 555 Fourth Street, NW Room 8104, Washington D.C. 20001.

Bernard Solnik

ATTACHMENT "E"


[Rose's Motion To Seal Publicly Available Records Regarding Arrest And
Related Court Proceedings, filed September 25, 2007 in F-431-99 and M-4035-00
(D.C. Superior Court)]


Judge Roberts
07-CV-0926

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Criminal Division

UNITED STATES

v.                                          :    Criminal No.: F 431-99
                                            :    AND
                                            :    Criminal No. M 4035-00
PETER ROSE                                  :

2007 SEP 25  P 3: 07

FILED

## MOTION TO SEAL PUBLICY AVAILABLE
## RECORDS REGARDING ARREST AND RELATED COURT PROCEEDINGS

COMES NOW PETER ROSE, by and through the undersigned counsel, and pursuant to

Section 803 of the Criminal Record Sealing Act of 2006, D.C. Code Title 16 Section 801 et seq.,

and pursuant to the Court's equitable powers, and respectfully moves this Honorable Court for

an order sealing any and all publicly available records regarding Movant's arrest on or about

January 16, 1999, and related court proceedings.

In support of this motion, movant states the following:

1.    On January 16, 1999, the movant was arrested by officers of the U.S. Park Police.

2.    On January 21, 1999, the movant was charged by complaint with one count of felony

      robbery (force and violence) in F431-99.

3.    At a preliminary hearing before this Court on April 1, 1999, the Court held that the

      government failed to establish probable cause and dismissed the case.

4.    A full year later, with no additional evidence upon which to justify being re-charged, on

      April 7, 2000, Mr. Rose was, based on the same arrest of January 16, 1999, charged by

      information with one count of misdemeanor simple assault and one count of

      misdemeanor taking property without right. Case No. M 4035-00. The charges were later

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

© 2007 Law Office of Bernard Solnik, LLC

dismissed on March 9, 2001, when the government entered a *nolle prosequi* on all charges.

5.  Under DC Code Sec. 16-803(a), Mr. Rose became eligible to have his publicly available misdemeanor records sealed once two years elapsed since the termination of that case on March 9, 2001 without Mr. Rose having been arrested or convicted of another offense. Under DC Code Sec. 16-803(b) Mr. Rose became eligible to have his publicly available felony record sealed once five years elapsed since the termination of that case on April 1, 1999 without Mr. Rose having been arrested or convicted of another offense. This Motion has been filed well beyond these two-year and five-year waiting periods, and since the January 16, 1999 arrest Mr. Rose has not been arrested or convicted of any criminal offense. (See Affidavit of Peter Rose, attached hereto.)

6.  Since Mr. Rose meets the aforesaid pre-requisites, under Section 16-803, if this Court finds that "it is in the interest of justice to grant relief," this Court should seal movant's arrest records. Section 16-803(h) enumerates ten criteria the Court should consider in making its determination. All ten factors weigh in favor of granting the relief sought herein. Below is a description of Mr. Rose, followed by each of the ten factors, along with an explanation of how that such factor militates in favor of granting this Motion:[1]

7.  Mr. Rose is and was since 1996 a private law and policy consultant in areas including health care, military defense, and other public policy fields whose clients do now and in the past have included major businesses serving the United States. He is a former senior Congressional staffer. For nearly ten years he was employed on Capitol Hill by various

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

---

[1] To support the facts, an affidavit by Movant is attached hereto. It is also important to note that under 16-803(a), should the Government oppose this motion, the burden of proof is on the prosecutor – not the movant. See 16-803(i)(1). With respect to movant's felony charge, under 16-803(i)(2), the burden is on the Movant, although it is the minimal burden of merely establishing a preponderance of evidence.

© 2007 Law Office of Bernard Solnik, LLC          2

members of Congress, with his last such position serving as Legislative Director for a U.S. Representative who now serves as the Secretary of the Army.

8. Mr. Roses' job also involves frequent travel throughout the United States and the world.

9. Mr. Rose is a lifelong U.S. citizen, who has never been arrested since January 16, 1999.

10. Applying the facts specifically to the ten factors for the Court to consider: [2]

   a. **The interests of the movant in sealing the publicly available records of his or her arrest, related court proceedings, or conviction 16-803(h)(1)(A):**

      i. Mr. Rose has suffered and continues to suffer severe adverse consequences solely as a result of the publicly available record of the arrest over six years ago, including the following:
         (a) being embarrassed when a colleague happened to come across his arrest record in the Superior Court's public records database; and
         (b) having heightened fear and apprehension that prospective clients, competitors, and colleagues will come across his arrest record and, despite Mr. Rose's assertions of innocence and lack of a conviction, misconstrue the arrest record as proof that Mr. Rose is dangerous, untrustworthy and/or lacking in integrity or otherwise not suitable to do business with or be associated with.

      Because Mr. Rose often works on policy matters of notable and significant public importance and public attention, he can be particularly damaged by such adverse impacts, and the nation and Mr. Rose's clients can also suffer should the focus of Mr. Rose's work be diverted by opponents from the substance of his policy proposals on account of an arrest record that resulted in a finding of no probable cause and nolle prossed charges.

As a result, Mr. Rose's ability to perform his job (which is in a highly competitive field), earn income, advance in his career, and travel freely and without undue fear have been severely and adversely jeopardized by the publicly available arrest record.

---

[2] Even in the absence of any specific example of the adverse impact of an arrest record, a grossly adverse impact on the arrestee is presumed to exist, as indicated by the Committee on the Judiciary of the D.C. Council, who found that "An arrest record alone has considerable potential for adverse consequences in the areas of private employment, government employment, governmental housing, admission to the military, and the acquisition of credit...Even a minor conviction can have consequences creating a de facto sentence without the possibility of parole." D.C. Council, Comm. On the Judiciary, Rep. On Bill 16-746, the Crim. Rec. Sealing Act of 2006, 16th Period, at 1 (D.C. 2006) (quoting Expungement Subcomm., Council for Court Excellence Apr. 14, 2006 Rep. (D.C. 2006). The Committee further found that "[t]he District has a responsibility to engage in the meaningful rehabilitation of its citizens," but that "[t]oo often, the stigma of a criminal record outweighs any rehabilitative efforts by the individual or the unique circumstances of their case." Id. at 2. Indeed, there likely have been and will be adverse impacts on the Movant's employment, personal relationships, and business relationships, of which (s)he is not even aware, but that arose on account of the arrest record.

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

© 2007 Law Office of Bernard Solnik, LLC     3

b. **The community's interest in retaining access to those records, including the interest of current or prospective employers in making fully informed hiring or job assignment decisions and the interest in promoting public safety 16-803(h)(1)(B):**

   i. Neither the community nor prospective employers have any interest in retaining access to Mr. Roses' arrest records. Mr. Rose's job responsibilities do not involve him personally undertaking or directing any public safety matters.

c. **The community's interest in furthering the movant's rehabilitation and enhancing the movant's employability 16-803(h)(1)(C):**

   i. As noted above, Mr. Rose's arrest record is impeding his ability to perform his job, earn income, and advance his career. As Mr. Rose is a highly productive member of our society and the local community (he primarily works in, and his office is based in, Washington DC), the community is best served by removing the impediments caused by his arrest record.

d. **The nature and circumstances of the offense at issue 16-803(h)(2)(A):**

   i. Mr. Rose has asserted his innocence at every stage, and the Court dismissed the felony charge for lack of probable cause and the Government dismissed the misdemeanor charges after Mr. Rose repeatedly declined to accept the plea bargain repeatedly offered to him by the Government.

e. The movant's role in the offense or alleged offense and, in cases terminated without conviction, the weight of the evidence against the person 16-803(h)(2)(B):

   i. Mr. Rose has asserted his innocence at every stage, and the Court dismissed the felony charge for lack of probable cause and the Government dismissed the misdemeanor charges after Mr. Rose repeatedly declined to accept the plea bargain repeatedly offered to him by the Government.

f. **The history and characteristics of the movant, including the movant's:**

   i. **Character 16-803(h)(2)(C)(i):** Mr. Rose's character can be attested to by the fact that he worked for Congress for over ten years, and that he continues to work closely with major private U.S. businesses.

   ii. **Physical and mental condition 16-803(h)(2)(C)(ii):** Mr. Rose has no relevant physical or mental conditions and is not under regular treatment for any physical or mental condition.

   iii. **Employment history 16-803(h)(2)(C)(iii):** Mr. Rose has been gainfully employed fulltme as a law and policy consultant since 1996. Prior to that he was employed for nearly ten years on Capitol Hill by various members of

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

© 2007 Law Office of Bernard Solnik, LLC        4

Congress, most recently serving as Legislative Director for a U.S. Representative.

iv.    **Prior and subsequent conduct 16-803(h)(2)(C)(iv):**  Mr. Rose has been a dedicated public servant as staff for the U.S. Congress from 1985 through 1995, and has had a successful legal and policy consultancy practice since 1996.

v.    **History relating to drug or alcohol abuse or dependence and treatment opportunities 16-803(h)(2)(C)(v):**  Mr. Rose has no such history.

vi.    **Criminal history 16-803(h)(2)(C)(vi):**  Mr. Rose has no criminal history in any jurisdiction, since January 16, 1999 other than the criminal history arising from the January 16, 1999 arrest.

vii.    **Efforts at rehabilitation 16-803(h)(2)(C)(vii):**  Mr. Rose continues to work in his chosen field and has remained gainfully employed fulltime since the arrest, and remains a highly respected and productive member of the community.

g.    **The number of the arrests or convictions that are the subject of the motion 16-803(h)(2)(D):**  There is only one arrest and there are zero convictions.

h.    **The time that has elapsed since the arrests or convictions that are the subject of the motion 16-803(h)(2)(E):**  A most considerable time has elapsed since January 16, 1999.

i.    **Whether the movant has previously obtained sealing or comparable relief under this section or any other provision of law other than by reason of actual innocence 16-803(h)(2)(F):**  Mr. Rose has never received any such relief.

j.    **Any statement made by the victim of the offense 16-803(h)(2)(G):**  Should any pertinent statement exist, same would be provided by the prosecutor.

11.    For the reasons set forth above, the movant requests that this Court order the movant's publicly available arrest records and all records of all proceedings related thereto, retrieved and sealed in accordance with DC Code Section 16-801 et seq.

12.    Under Section 16-805(b), the Court shall not decide this Motion until after the Court proactively orders the prosecutor to file a response to the motion, after which the prosecutor has either sixty (60) days from the issuance of the order in which to file the response except where the arrest was not presented to the prosecutor for a charging

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

© 2007 Law Office of Bernard Solnik, LLC    5

decision, in which case the prosecutor shall file the response within ninety (90) days of the issuance of the order. Accordingly, it is further requested that the Court issue such an Order and that such an Order further require that any response be served on the undersigned counsel so that Movant may have an opportunity to respond should he deem it appropriate or necessary.

13.  In the alternative, if for some reason the Court finds that Movant does not meet the requirements of Section 16-803, Movant requests that this Court grant Movant equitable relief and seal Movant's arrest records and all records of all proceedings related thereto pursuant to *Rezvan v. District of Columbia*, 582 A.2d 937, 938 (D.C. 1990) (sealing is an equitable remedy and the court may grant relief independent of any other grounds for sealing of one's arrest record).

WHEREFORE, for these and such other reasons as may appear to the Court, movant respectfully requests that

(a)  this motion be granted;

(b)  pursuant to D.C. Code Secs. 16-804(d) and 16-805(b) the prosecutor be Ordered to file a response, if any, within ninety (90)[3] days of the issuance of the Order and that the prosecutor serve on Movant's attorney a copy of any such response and/or further filings by the prosecutor in this matter;

(c)  that all publicly available records regarding Movant's arrest on January 16, 1999, and related court proceedings be SEALED; and

(d)  for such other and further realief as Movant's cause may require.

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

© 2007 Law Office of Bernard Solnik, LLC          6

Respectfully submitted,

Bernard Solnik, Esq. Unified Bar No. 448453
11 N. Washington St. Suite 640
Rockville, MD 20850
301-294-9200

## Points and Authorities

- DC Code Title 16-801 et seq.;
- *Rezvan v. District of Columbia*, 582 A.2d 937, 938 (D.C. 1990);
- D.C. Council, Comm. On the Judiciary, Rep. On Bill 16-746, the Crim. Rec. Sealing Act of 2006, 16th Period,;
- The Record Herein

Bernard Solnik Unifed Bar No. #448453

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2007, a copy of the foregoing Motion and Points and Authorities and any attachments thereto were mailed, first class U.S. mail, postage prepaid, to Chief, Special Proceedings Division, U.S. Attorney's Office, 555 Fourth Street Room 10-435, Washington DC 20530.

Bernard Solnik, Esq.

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

---

[3] If the Court is able to determine that the Movant's arrest was presented to the prosecutor for a charging decision, then the Prosecutor should be ordered to file a response, if any, within only sixty (60) days of the issuance of the Order. D.C. Code Sec. 16-805(b).

© 2007 Law Office of Bernard Solnik, LLC                7

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Criminal Division

| | |
|---|---|
| UNITED STATES | : |
| | : |
| v. | : Criminal No.: F 431-99 |
| | : AND |
| | : Criminal No. M 4035-00 |
| PETER ROSE | : |

### Affidavit of Peter J. Rose

The undersigned, being duly sworn, hereby affirms under penalty of perjury as follows:

1. That I am at least eighteen (18) years of age; that I am competent to testify, and that this Affidavit is true and correct to the best of my personal knowledge, information and/or belief.

2. That I have read the Motion To Seal Publicly Available Records Regarding Arrest And Related Court Proceedings to which this Affidavit is attached.

3. That the facts set forth in paragraphs 7 through and including 10 of said motion are true and correct to the best of my personal knowledge.

4. That the facts set forth in the other paragraphs of the motion are true and correct to the best of my personal knowledge, information and/or belief.

_____
Peter J. Rose

District of Columbia, ss:

Subscribed and sworn to before me this _20_ day of September, 2007.

_____
Notary Public

My Commission Expires: _10/14/11_

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

20th of Sept 2007

© 2007 Law Office of Bernard Solnik, LLC          12

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Criminal Division

UNITED STATES                              :
                                           :
v.                                         :    Criminal No.: F 431-99
                                           :    AND
                                           :    Criminal No. M 4035-00
PETER ROSE_____:

## ORDER

Upon consideration of Peter Rose's Motion To Seal Publicly Available Records Regarding Arrest And Related Court Proceedings, and any opposition thereto, the Court hereby finds that it is in the interests of justice to seal the public criminal records of the movant's arrest and any related court proceedings. Accordingly it is this _____ day of _____ 2007

**ORDERED**; that Peter Rose's Motion To Seal Publicly Available Records Regarding Arrest And Related Court Proceedings is hereby GRANTED; and it is further

**ORDERED**; that the office of the prosecutor, the law enforcement agency responsible for movant's arrest, the U.S. Park Police, the Metropolitan Police Dept., the Federal Bureau of Investigation, the Pretrial Services Agency, the D.C. Dept. of Corrections, the Court Services and Offender Supervision Agency, and the Clerk of the Superior each shall remove from their publicly available records all references that identify the movant as having been arrested, prosecuted, or convicted; and it is further

**ORDERED**; that the aforesaid prosecutor, any law enforcement agencies, pretrial, corrections, and or community supervision agencies shall each file a certification with the Court within 90 days of the date of this Order certifying that, to the best of its knowledge and belief, all references that identify the movant as having been arrested, prosecuted, or convicted have been removed from its publicly available records and from the publicly available files of any public

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-244-9200

© 2007 Law Office of Bernard Solnik, LLC            8

entity to which movant's information had been disseminated by the entity making the certification; and it is further

ORDERED; that any other prosecutor, law enforcement agency, pretrial, corrections, or community supervision agency or other public agency with any records identifying the movant as having been arrested, prosecuted, or convicted, shall upon receiving a copy of this Order remove from their publicly available records all references that identify the movant as having been arrested, prosecuted, or convicted and shall file a certification with the Court within 90 days after having received a copy of this Order certifying that, to the best of its knowledge and belief, all references that identify the movant as having been arrested, prosecuted, or convicted have been removed from its publicly available records and from the publicly available files of any public entity to which movant's information had been disseminated by the entity making the certification; and it is further

ORDERED; that unless otherwise ordered by the Court, the Clerk of the Superior Court and any other agency or entity referenced in this Order shall reply in response to inquiries from the public concerning the existence of records pertaining to the movant's arrest or any related court proceedings that no records are available; and it is further

ORDERED; that the movant shall not be held thereafter under any provision of law to be guilty of perjury or otherwise giving a false statement by reason of failure to recite or acknowledge his or her arrest, charge, trial, or conviction in response to any inquiry made of him or her for any purpose except that the sealing of records under this provision does not relieve a person of the obligation to disclose the sealed arrest or conviction in response to any direct question asked in connection with jury service or in response to any direct question contained in any questionnaire or application for a position with any person, agency, organization, or entity

BERNARD A. SOLNIK
ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850
TELEPHONE 301-294-9200

© 2007 Law Office of Bernard Solnik, LLC

9

defined in D.C. Code § 16-801(11).

_____
SUPERIOR COURT JUDGE

Cc:
Bernard Solnik, Esq.
11 N. Washington St., Suite 640
Rockville, MD 20850
Tel. 301-294-9200
Fax 202-350-9562
Attorney for Peter J. Rose

Chief, Special Proceedings Division
U.S. Attorney's Office
555 Fourth Street Room 10-435
Washington DC 20530

BERNARD A. SOLNIK

ATTORNEY AT LAW
SUITE 640
11 N. WASHINGTON ST.
ROCKVILLE, MD 20850

TELEPHONE 301-294-9200

© 2007 Law Office of Bernard Solnik, LLC          10

ATTACHMENT "F"


[United States v. Shrivastava, slip op., Cr. No. 71-1976 (TFH) (D.D.C. June 4, 2002)]

Judge Roberts
07-CV-0926

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                )
                                         )
        v.                               ) Cr. No. 71-1976 (TFH)
                                         )
ARUN K. SHRIVASTAVA,                     )        **FILED**
                                         )
        Defendant.                       )        **JUN 0 4 2002**

                                         NANCY MAYER WHITTINGTON, CLERK
                                              U.S. DISTRICT COURT

                        **ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Mr. Shrivastava's motion to expunge [#1] is **DENIED**.

**SO ORDERED**.

June ___, 2002

                                  _____
                                        Thomas F. Hogan
                                        Chief Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀Cr. No. 71-1976 (TFH)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ARUN K. SHRIVASTAVA,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀⠀⠀)

**FILED**

**JUN 0 4 2002**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION

⠀⠀⠀⠀⠀Pending before the Court is Mr. Shrivastava's motion to expunge his FBI arrest records, which is opposed by the government. Upon careful consideration of the motion, the opposition and the reply thereto,[1] and the entire record herein, the Court will deny Shrivastava's motion.

⠀⠀⠀⠀⠀In his motion, Shrivastava asks the Court to expunge two arrest records, one for "extortion" and the other for "interstate threat to injure person," both dated July 9, 1971. Def.'s Mot. at 1; Def.'s Ex. 2 (copy of FBI arrest record); Gov't Ex. 1 (copy of FBI arrest record). In support of his request, Shrivastava states that a grand jury never indicted him on the basis of some of the available facts underlying the charges, and an indictment that did issue was ultimately dismissed through joint motion by the parties and approval by another judge of this Court in 1973. He complains that because of his arrest record, he has been unable to secure residency in this country, and in many other countries, since being deported from the United States in the mid-1970s. Def.'s Mot. at 1.

⠀⠀⠀⠀⠀The Court, however, can find no basis for expunging the challenged arrest records. First, Shrivastava has cited no statutory authority for expunging his arrest records, and the Court is aware of none. Cf., e.g., Doe v. Webster, 606 F.2d 1226, 1230 (D.C. Cir. 1979); United States v.

---

[1] Shrivastava's reply brief is entitled "Defendant's Motion to Government's Opposition."

Schnitzer, 567 F.2d 536, 539 (2d Cir. 1977). Second, while this Court has the inherent, equitable

power to expunge an arrest record, Webster, 606 F.2d at 1230; Livingston v. U.S. Dep't of

Justice, 759 F.2d 74, 78 (D.C. Cir. 1985), Shrivastava has failed to make the requisite showing

for doing so. To exercise its inherent, equitable power to expunge an arrest record, the Court

must find that under the particular facts and circumstances of the case the " 'remedy is necessary

and appropriate in order to preserve basic legal rights.' " Livingston, 759 F.2d at 78 (quoting

Sullivan v. Murphy, 478 F.2d 938, 968 (D.C. Cir. 1973)). In other words:

> [A]lthough there are indeed many instances in which courts have ordered
> expungement of arrest records in the exercise of their inherent equitable powers,
> all of these cases involved either a lack of probable cause coupled with special
> circumstances, flagrant violations of the Constitution, or other unusual and
> extraordinary circumstances.

Webster, 606 F.2d at 1230 (footnotes and citations omitted). Thus, the general rule "is that

expungement of an arrest record is appropriate when serious governmental misbehavior leading

to the arrest, or unusually substantial harm to the defendant not in any way attributable to him,

outweighs the government's need for a record of the arrest." Id. at 1231; accord Schnitzer, 567

F.2d at 539 (stating that "expungement lies within the equitable discretion of the court, and relief

usually is granted only in 'extreme circumstances,' " and that "[i]n determining whether such

circumstances exist, courts have considered the 'delicate balancing of the equities between the

right of privacy of the individual and the right of law enforcement officials to perform their

necessary duties"). In conclusory fashion, Shrivastava asserts that "between 1971-73 [the] FBI

made a number of arrest [sic] under political pressure and without probable cause which were all

subsequently dismissed," and he maintains that the FBI charges are "frivolous" and were made

"in flagrant violation of the constitution." Def.'s Reply at 1, 4, 5, 6. As pointed out by the

2

government, however, Shrivastava has entirely failed to elaborate on, let alone substantiate, these conclusory allegations. The Court thus cannot credit his claims that the arrests at issued lacked probable cause or somehow were otherwise in violation of the Constitution, and it can find no extraordinary circumstances that compel a finding that the harm averred by Shrivastava is not attributable to him and outweighs the government's need to maintain the records. The Court therefore will deny his motion.

An appropriate Order will accompany this Memorandum Opinion.

June ___, 2002

Thomas F. Hogan
Chief Judge

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PETER ROSE, | ) | |
|     Plaintiff | ) | |
| | ) | |
|       v. | ) | 07-CV-0926 (RWR) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
|    et al., | ) | |
|     Defendants | ) | |
| | ) | |

<u>ORDER</u>

Before the Court are Plaintiff's Complaint and the Federal Defendants' Motion Under Rule 12(b)(1) To Dismiss For Lack Of Subject Matter Jurisdiction.  Upon consideration of the entire record herein, and for the reasons set forth in the Federal Defendants' Motion To Dismiss, it is this ____ day of _____, 2007, hereby

ORDERED that the action initiated by Plaintiff's Complaint is DISMISSED for lack of subject matter jurisdiction.

                                    _____
                                      Richard W. Roberts
                                      United States District Judge

<u>copies to:</u>

Thomas S. Rees
Assistant United States Attorney
555 - 4th Street, N.W.
Washington, D.C. 20530

Bernard A. Solnik, Esq.
Ste. 640
11 N. Washington Street
Rockville, MD 20850

Jayme B. Kantor
Assistant Attorney General
442 4th Street, N.W.
6th Floor South
Washington, D.C. 20001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER ROSE,       )
   Plaintiff      )
           )
   v.       )  07-CV-0926 (RWR)
           )
UNITED STATES OF AMERICA,  )
   et al.,       )
   Defendants     )
           )

ORDER

   Before this Court are the Plaintiff's Complaint and the Federal Defendants' Motion Under

Rule 12(b)(6) To Dismiss For Failure To State A Claim.  Upon consideration of the entire record

herein, and for the reasons set forth in the Federal Defendants' Motion To Dismiss,  it is this ____

day of _____, 2007, hereby

   ORDERED that the action initiated by Rose's Complaint is DISMISSED for failure to state

a claim.

             _____
             Richard W. Roberts
             United States District Judge

copies to:

Thomas S. Rees
Assistant United States Attorney
555 - 4th Street, N.W.
Washington, D.C. 20530

Bernard A. Solnik, Esq.
Ste. 640
11 N. Washington Street
Rockville, MD 20850

Jayme B. Kantor
Assistant Attorney General
442 - 4th Street, N.W.
6th Floor South
Washington, D.C. 20001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER ROSE,                                    )
      Plaintiff                          )
                                               )
          v.                        )          07-CV-0926 (RWR)
                                               )
UNITED STATES OF AMERICA,                      )
      et al.,                            )
      Defendants                         )
_____)

ORDER

        Upon consideration of the entire record herein, it is this ____ day of _____, 2007,

hereby

        ORDERED that this action is stayed until further order of the Court, pending complete and

final resolution, including any appellate proceedings, in connection with Rose's motion to seal filed

in Superior Court on September 25, 2007.

_____
Richard W. Roberts
United States District Judge

copies to:

Thomas S. Rees
Assistant United States Attorney
555 - 4th Street, N.W.
Washington, D.C. 20530

Bernard A. Solnik, Esq.
Ste. 640
11 N. Washington Street
Rockville, MD 20850

Jayme B. Kantor
Assistant Attorney General
442 4th Street, N.W.
6th Floor South
Washington, D.C. 20001